AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH

███████████████████

)
)
)
)
)
)

Case: 1:17-mj-00982
Assigned To : Howell, Beryl A.
Assign. Date : 12/19/2017
Description: Search and Seizure Warrant

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the          Northern          District of          California
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before          January 2, 2018          *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to          Hon. Beryl A. Howell          .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     *12/19/2017 at 2PM*

*Beryl A. Howell*
*Judge's signature*

City and state:          Washington, DC

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

DEC 19 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# UNITED STATES DISTRICT COURT
for the
District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*
INFORMATION ASSOCIATED WITH
█████████████████████

)
)
)
)
)

Case: 1:17-mj-00982
Assigned To : Howell, Beryl A.
Assign. Date : 12/19/2017
Description: Search and Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.
This warrant is sought pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1030 | Fraud and related activities in connection with computers |
| 18 U.S.C. § 371; 2 | Conspiracy against the United States; Aiding and abetting |
| 52 U.S.C. § 30121 | Foreign contribution ban |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

Aaron Zelinsky (ASC)

*Applicant's signature*

Amy Anderson, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____12/19/2017_____

*Judge's signature*

City and state:  Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

**FILED**

DEC 1 9 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ████████████████ | Case: 1:17-mj-00982<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 12/19/2017<br>Description: Search and Seizure Warrant |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Amy A. Anderson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for
information associated with the following email account (hereafter the **Target Account**),
described in more detail in Attachments A and B:

- ████████████████(the "**Target Account**") an email address associated
  with ██████ ████████, described further in Attachment A, maintained by
  Google;

The information to be disclosed by Google (hereafter "the Provider") and searched by the
government is described in the following paragraphs and in Attachments A and B.  This affidavit
is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), and 2703(c)(1)(A).

2.     I am a Special Agent with Federal Bureau of Investigation ("FBI") assigned to
FBI Headquarters working directly with the Special Counsel's Office. I have been a Special
Agent with the FBI since 2010. Since then, I have conducted national security investigations of
foreign intelligence services, espionage, and counter proliferation matters. I have training and
experience related to espionage and foreign intelligence services national security investigations.

I have conducted and participated in various investigations involving multiple threat countries as well as national security threats and applicable criminal violations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **Target Account** contains communications relevant to violations of 18 U.S.C. § 1030 (fraud and related activities in connection with computers), 52 U.S.C. § 30121 (foreign contribution ban), 18 U.S.C. § 371 (conspiracy to commit an offense against the United States), and 18 U.S.C. § 2 (aiding and abetting).

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *Id.* §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  The offense conduct included activities in Washington, D.C., as detailed below, including in paragraph 11.

## SUMMARY

6.      On or about July 25, 2016, Roger STONE emailed Jerome CORSI to "Get to Assange" in person at the Ecuadorian Embassy and "get pending WikiLeaks emails[.]"  On or about August 1, 2016, STONE also instructed CORSI to have ▮▮▮▮ ▮▮▮▮▮ (the user of the **Target Account**) contact Julian ASSANGE.  On or about August 2, 2016, CORSI responded

2

to STONE that the "word is friend in embassy [ASSANGE] plans 2 more dumps.  One shortly after I'm back. 2nd in October. Impact planned to be very damaging.... Time to let Podesta to be exposed as in bed w enemy if they are not ready to drop HRC."  Information disclosures subsequently occurred on or about the times CORSI predicted: On or about August 12, 2016, the day CORSI was scheduled to return to the United States ("shortly after I'm back"), Guccifer 2.0 released hacked information related to the Democratic Congressional Campaign Committee (DCCC). On October 7, 2016 ("in October"), WikiLeaks began releasing emails hacked from John Podesta's email account.

7.      On or about November 13, 2016, ████████, using the **Target Account**, emailed Stone to congratulate him on "tak[ing] the country back," and stating, "You deserve a lot of credit and working with you and Jeri Corsi, who is with me now in London has been a great joy."  On or about January 7, 2017, ████████, using the **Target Account** emailed recipients about John Podesta going "phishing."

## PROBABLE CAUSE.

### A.  Background on Relevant Individuals

#### i.  Roger STONE

8.      Roger STONE is a self-employed political strategist/consultant and has been actively involved in U.S. politics for decades.  STONE worked on the presidential campaign of Donald J. Trump (the "Campaign") until August 2015.  Although Stone had no official relationship with the Campaign thereafter, STONE maintained his support for Trump and continued to make media appearances in support of Trump's presidential campaign.  As described further below, STONE also maintained contact with individuals employed by the

Campaign, including then-campaign chairman Paul MANAFORT and deputy chairman Rick

GATES.

ii. *Jerome CORSI*

9.      Jerome CORSI is a political commentator who, according to publicly available

information, serves as the "Washington Bureau Chief for Inforwars.com."  According to

publicly-available sources, from 2014 until January 2017, CORSI was a "senior staff reporter"

for the website "World Net Daily" a/k/a "WND.com."  CORSI has also written a number of

books regarding Democratic presidential candidates.  As described further below, CORSI was in

contact with STONE during the summer and fall of 2016 regarding forthcoming disclosures of

hacked information by WikiLeaks, and appears to have obtained information regarding

upcoming disclosures which he relayed to STONE.



████████████████████████████████████████

**B. Disclosure of Hacked Information by WikiLeaks During the 2016 Presidential Campaign**

11.     According to the public and unclassified intelligence report prepared by the

United States Intelligence Community, Russian intelligence gained access to the Democratic

National Committee (DNC) networks in July 2015 and maintained that access until at least June

2016.  By March 2016, the Russian military intelligence (General Staff Main Intelligence

Directorate or "GRU") probably began cyber operations aimed at the U.S. election.  The GRU

operations resulted in the compromise of personal e-mail accounts within the DNC and other

Democratic Party officials and political figures.  By in or about May 2016, the GRU had

exfiltrated large volumes of data from the DNC. The DNC headquarters is located at 430 South

Capitol Street SE, Washington, D.C. 20003.

12.     The public and unclassified intelligence report assessed that:

a.      The GRU used a Twitter account, "Guccifer 2.0" and the website

DCLeaks.com to release the U.S. victim data obtained in cyber operations publicly and in

exclusives to media outlets and relayed material to WikiLeaks.

b.      Guccifer 2.0, who claimed to be an independent Romanian hacker, made

multiple contradictory statements and false claims about his likely Russian identity

throughout the election.

c.      Content that was taken from e-mail accounts targeted by the GRU in

March 2016 appeared on DCLeaks.com starting in June 2016.

d.      The GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks. WikiLeaks was mostly likely chosen because of its self-proclaimed reputation for authenticity. Disclosures through WikiLeaks did not contain any evident forgeries.

e.      The Kremlin's principal international propaganda outlet RT (formerly Russia Today) has actively collaborated with WikiLeaks. RT's editor-in-chief visited WikiLeaks founder Julian ASSANGE at the Ecuadorian Embassy in London in August 2013, where they discussed renewing his broadcast contract with RT, according to Russian and Western media. Russian media has subsequently announced that RT had become "the only Russian media company" to partner with WikiLeaks and had received access to "new leaks of secret information."

13.     On or about June 14, 2016, the Washington Post reported that "Russian government hackers" had penetrated the DNC computer network and stole opposition research on Donald J. Trump.  The Kremlin's spokesman denied any Russian involvement in the hack.

14.     On or about June 15, 2016, Guccifer 2.0 claimed responsibility for the DNC hack and began posting hacked documents.

15.     On or about July 22, 2016, WikiLeaks published about 20,000 emails stolen from the DNC.

16.     On or about August 12, 2016, Guccifer 2.0 released personal cellphone numbers and email addresses from the files of the Democratic Congressional Campaign Committee (DCCC).

17.     On or about August 21, 2016, Roger STONE sent a publicly-available tweet referring to John Podesta, Hillary Clinton's presidential campaign manager, stating: "Trust me, it

will soon the [sic] Podesta's time in the barrel. #CrookedHillary."   In a C-SPAN interview that same day, Stone reiterated that because of the work of a "'mutual acquaintance' of both his and [Assange], the public [could] expect to see much more from the exiled whistleblower in the form of strategically-dumped Clinton email batches." He added: "Well, first of all, I think Julian Assange is a hero… I think he's taking on the deep state, both Republican and Democrat.  I believe that he is in possession of all of those emails that Huma Abedin and Cheryl Mills, the Clinton aides, believe they deleted.  That and a lot more.  These are like the Watergate tapes."

18.     On Friday, October 7, 2016, at approximately 4:03 P.M., the Washington Post published an article containing a recorded conversation from a 2005 Access Hollywood shoot in which Mr. Trump had made a series of lewd remarks.

19.     Approximately a half hour later, at 4:32 P.M., WikiLeaks sent out a public Tweet reading "RELEASE: The Podesta Emails #HillaryClinton #Podesta #imWithHer" and containing a link to approximately 2,050 emails that had been hacked from John Podesta's personal email account. WikiLeaks continued to release John Podesta's hacked emails throughout October 10-14, 2016.

### C. Roger STONE's Private Twitter Messages with Guccifer 2.0, WikiLeaks, and Julian ASSANGE.

20.     As discussed above, on or about July 22, 2016, WikiLeaks published approximately 20,000 emails stolen from the DNC.

21.     On August 5, 2016, Roger Stone published an article on Breitbart.com entitled, "Dear Hillary: DNC Hack Solved, So Now Stop Blaming Russia." Stone wrote:  "It doesn't seem to be the Russians that hacked the DNC, but instead a hacker who goes by the name of Guccifer 2.0."

22.     On August 12, 2016, Guccifer 2.0 publicly tweeted: "@RogerJStoneJr thanks that u believe in the real #Guccifer2." That same day, Guccifer 2.0 released the personal cellphone numbers and email addresses from the files of the Democratic Congressional Campaign Committee (DCCC).

23.     On August 13, 2016, Stone posted a tweet using @RogerJStoneJr calling Guccifer 2.0 a "HERO" after Guccifer 2.0 had been banned from Twitter.  The next day, Guccifer 2.0's Twitter account was reinstated.

24.     On August 14, 2016, Stone sent a private message on Twitter using @RogerJStoneJr to Guccifer 2.0, stating he was "delighted" to see the user's Twitter handle reinstated after having been suspended.[1]

25.     On August 15, 2016, Guccifer 2.0 replied to Stone at @RogerJStoneJr, stating: "wow. thank u for writing back, and thank u for an article about me!!! did you find anything interesting in the docs I posted."

26.     On August 16, 2016, Stone sent a private message using @RogerJStoneJr asking Guccifer to retweet an article he had written regarding the 'rigg[ing]' of the 2016 presidential elections.

27.     On August 17, 2016, Guccifer 2.0 publicly tweeted, "@RogerJStoneJr paying you back." Guccifer also sent a private message to @RogerJStoneJr stating "i'm pleased to say u r great man. please tell me if I can help u anyhow. it would be a great pleasure to me."

28.     On August 18, 2016, Paul Manafort, Stone's longtime friend and associate, resigned as Chairman of the Campaign.  Contemporary press reports at the time indicated that

---

[1] On or about August 7, 2017, Chief Judge Beryl A. Howell issued a search warrant for the Twitter account @RogerJStoneJr.

Manafort had working with a Washington D.C.-based lobbying firms to influence U.S. policy toward Ukraine.

29.     On August 21, 2016, using @RogerJStoneJR, Stone directed a tweet at John Podesta, Hillary Clinton's presidential campaign manager, stating: "Trust me, it will soon the [sic] Podesta's time in the barrel. #CrookedHillary."

30.     On September 16, 2016 Stone said in a radio interview with Boston Herald Radio that he expected WikiLeaks to "drop a payload of new documents on a weekly basis fairly soon. And that of course will answer the question of exactly what was erased on that email server."

31.     On Saturday, October 1, 2016, using @RogerJStoneJr, Stone Tweeted, "Wednesday @ HillaryClinton is done. #WikiLeaks."

32.     On Sunday, October 2, 2016, MSNBC Morning Joe producer Jesse Rodriquez tweeted regarding an announcement Julian Assange had scheduled for the next day from the balcony of the Ecuadoran Embassy in London.  On the day of the Assange announcement – which was part of WikiLeaks' 10-year anniversary celebration – Stone told Infowars that his intermediary described this release as the "mother load."

33.     On Tuesday, October 4, 2016, Stone used @RogerJStoneJr to tweet: "Payload coming. #Lockthemup."

34.     As discussed above, on Friday, October 7, 2016, WikiLeaks began to release emails that had been hacked from John Podesta's personal email account.

35.     On or about October 12, 2016, John Podesta – referring back to Stone's August 21, 2016 C-SPAN and Twitter references – argued publicly that "[it is] a reasonable assumption to - or at least a reasonable conclusion - that [Stone] had advanced warning [of the release of his emails] and the Trump campaign had advanced warning about what Assange was going to do. I

9

think there's at least a reasonable belief that [Assange] may have passed this information on to [Stone]." Commenting to the Miami Herald, Stone responded: "I have never met or spoken with Assange, we have a mutual friend who's traveled to London several times, and everything I know is through that channel of communications. I'm not implying I have any influence with him or that I have advanced knowledge of the specifics of what he is going to do. I do believe he has all of the e-mails that Huma Abedin and Cheryl Mills, the Clinton aides, thought were deleted. I hear that through my emissary."

36.    On or about the next day, October 13, 2016, @RogerJStoneJr sent a private direct message to the Twitter account @WikiLeaks. The message read: "Since I was all over national TV, cable and print defending WikiLeaks and assange against the claim that you are Russian agents and debunking the false charges of sexual assault as trumped up bs you may want to rexamine the strategy of attacking me- cordially R." Less than an hour later, @wikileaks responded by direct message: "We appreciate that. However, the false claims of association are being used by the democrats to undermine the impact of our publications. Don't go there if you don't want us to correct you."

37.    On October 16, 2016, @RogerJStoneJr sent a direct message to @wikileaks: "Ha! The more you \"correct\" me the more people think you're lying. Your operation leaks like a sieve. You need to figure out who your friends are."

38.    On November 9, 2016, one day after the presidential election, @wikileaks sent a direct message to @RogerJStoneJr containing a single word: "Happy?" @wikileaks immediately followed up with another message less than a minute later: "We are now more free to communicate."

10

39.     On March 10, 2017, Stone spoke with *The Washington Times* and acknowledged he had been in contact with Guccifer 2.0 using @RogerJStoneJr. Stone publicly stated that he had been in contact with Guccifer 2.0 regarding the DNC hack, and that he had used Twitter's private message system to do so. Stone provided a copy of the private messages to *The Washington Times*.

40.     On or about March 27, 2017, CNN reported that a representative of WikiLeaks, writing from an email address associated with WikiLeaks, denied that there was any backchannel communication during the Campaign between Stone and WikiLeaks. The same article quoted Stone as stating: "Since I never communicated with WikiLeaks, I guess I must be innocent of charges I knew about the hacking of Podesta's email (speculation and conjecture) and the timing or scope of their subsequent disclosures. So I am clairvoyant or just a good guesser because the limited things I did predict (Oct disclosures) all came true."

41.     On or about June 4, 2017, @RogerJStoneJr directly messaged @JulianAssange, an address associated with Julian Assange in numerous public reports, stating: "Still nonsense. As a journalist it doesn't matter where you get information only that it is accurate and authentic. The New York Times printed the Pentagon Papers which were indisputably stolen from the government and the courts ruled it was legal to do so and refused to issue an order restraining the paper from publishing additional articles. If the US government moves on you I will bring down the entire house of cards. With the trumped-up sexual assault charges dropped I don't know of any crime you need to be pardoned for - best regards. R." That same day, @JulianAssange responded: "Between CIA and DoJ they're doing quite a lot. On the DoJ side that's coming most strongly from those obsessed with taking down Trump trying to squeeze us into a deal."

42.     On or about June 10, 2017, @RogerJStoneJr sent a direct message to @wikileaks,
reading: "I am doing everything possible to address the issues at the highest level of
Government. Fed treatment of you and WikiLeaks is an outrage. Must be circumspect in this
forum as experience demonstrates it is monitored. Best regards R."

**D. Roger STONE's Emails with Jerome CORSI and** ██████████

43.     On September 11, 2017, Chief Judge Beryl A. Howell of the District of Columbia
issued a search warrant for STONE's ████ l address, ████████████ Emails
recovered pursuant to that search warrant indicated the following:

44.     On or about June 20, 2016, ████████, using the **Target Account**, emailed
STONE and Paul MANAFORT, the Campaign Chairman, asking to "know immediately how I
can help" the Campaign. ████████ also wrote that his "research on Rhodes House" was
nearing completion.  The "Rhodes House" research appears to be a reference to STONE's
previous tweet on or about October 13, 2015 that, "In 1969, Bill Clinton was expelled from
Oxford for raping nineteen-year-old ████████." Rhodes House is the headquarters of the
Rhodes Trust, and STONE mentioned ████████ again to ████████ a month later, as
discussed below.

45.     On or about July 7, 2016, ████████, using the **Target Account**, emailed Stone
that he had "my tickets to Cleveland[.] [D]o you have my credential pack?" ████████ appears
to be referencing the Republican National Convention held in Cleveland.

46.     On or about July 25, 2016, ████████, using the **Target Account**, forwarded
an email to STONE and CORSI with the subject line: "Fwd: The Bill Gates of Turkey wants to
create a campaign for Donald J Trump in Turkey." ████████ wrote: "Do you want to have a
talk about this? Turkey is for Trump!"  Below was a forwarded message sent to the **Target**

**Account** from an individual who stated that he had been contacted by the "Bill Gates of Turkey, in regards to creating a robust campaign for Mr Donald J Trump."

47.     On or about that same day, July 25, 2016, (approximately three days after WikiLeaks began releasing emails hacked from the DNC), ████ ████ emailed Roger STONE with the subject line, "You need to get to Assange." The body of the message read: "At Ecuadorian Embassy in London and get the pending wikileaks emails...they deal with Foundation, allegedly."

48.     According to records ████ ████ ██ ████, approximately ninety minutes later STONE called CORSI and they spoke for 26 minutes.

49.     Less than two hours after the phone call to CORSI, STONE emailed CORSI at with the subject line, "Get to Assange." The body of the message read: "Get to Assange [a]t Ecuadorian Embassy in London and get pending WikiLeaks emails...they deal with Foundation, allegedly." It appears that STONE cut and pasted the email from ████, to CORSI.

50.     On or about July 27, 2016, then-candidate Donald Trump stated in a press conference, "Russia, if you are listening, I hope you're able to find the 30,000 [Hillary Clinton] emails that are missing. I think you will probably be rewarded mightily by our press. Let's see if that happens. That will be next."

51.     On or about July 28, 2016, Roger STONE called Richard GATES (then the deputy-chair of the Campaign). The two spoke for approximately twelve minutes.

52.     On or about July 30, 2016, Paul MANAFORT (then the Chairman of the Campaign) called STONE.  The two spoke for approximately one hour and seven minutes. The Government has analyzed toll records from January 1, 2016 to November 9, 2016. Sixty-seven

13

minutes is the longest call (by almost a half-hour) that took place between STONE and

MANAFORT in this time period.

53.      On or about July 31, 2016, STONE called GATES and the two spoke for

approximately 5 minutes. Approximately ninety minutes later, STONE emailed CORSI at with

the subject line, "Call me MON." The Body read: ▓▓▓▓ should see Assange[.] ▓▓▓▓▓

should find Bernie sanders brother who called Bill a Rapist – turn him for Trump[.] ▓▓▓▓

should find ▓▓▓▓▓▓▓ or more proof of Bill getting kicked out."

54.      On or about August 2, 2016 (approximately 19 days before STONE publicly

tweeted about "Podesta's time in the barrel"), CORSI emailed STONE: "With family, 25th

wedding anniversary Aug 9. Return Home Aug 12. Word is friend in embassy plans 2 more

dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging . . .Time to

let more than Podesta to be exposed as in bed w enemy if they are not ready to drop HRC.  That

appears to be the game hackers are now about. Would not hurt to start suggesting HRC old,

memory bad, has stroke -- neither he nor she well. I expect that much of next dump focus, setting

stage for Foundation debacle." Based on my training, experience, and review of materials in this

case, it appears that CORSI's reference to a "friend in embassy [who] plans 2 more dumps"

refers to Julian ASSANGE, the founder of WikiLeaks, who resided in Ecuador's London

Embassy in 2016.  As discussed above, Guccifer released information hacked from the DCCC on

August 12, 2016 (the date CORSI identified as when he would "return home.").

55.      On or about August 16, 2016, CORSI, emailed STONE a link to a piece CORSI

had written about STONE titled, "Trump Adviser: WikiLeaks Plotting Email Dump to Derail

Hillary."

14

56.     On or about August 31, 2016, CORSI, using emailed STONE: "Did you get the Podesta writeup." STONE replied "yes."

57.     On or about September 6, 2016, CORSI, emailed STONE: "Roger[,] Is NY Post going to use the Pedesta [sic] stuff?"

58.     On or about October 7, 2016, WikiLeaks began releasing the Podesta emails.

59.     On or about October 12, 2016, the same day on which Podesta accused STONE of having advance knowledge of the publication of his emails, CORSI emailed STONE with the subject line "Podesta talking points." Attached to the email was a file labeled, "ROGER STONE podesta talking points Oct 12 2016.docx." The "talking points" included the statement that, "Podesta is at the heart of a Russian-government money laundering operation that benefits financially Podesta personally and the Clintons through the Clinton Foundation." CORSI followed up several minutes later with another email to STONE titled, "Podesta talking points," with the text "sent a second time just to be sure you go it." STONE emailed CORSI, "Got them and used them."

60.     On or about October 17, 2016, CORSI emailed STONE with the subject, "Fwd: ASSANGE...URGENT..." CORSI wrote, "From a very trusted source," and forwarded an email with the header information stripped out, showing only the body text. The email read, "Yes[.] I figured this. Assange is threatening Kerry, Ecuador and U.K. He will drop the goods on them if they move to extradite him. My guess is that he has a set of dead man files that include Hillary. It's what they used to call a 'Mexican stand off[.]' Only hope is that if Trump speaks out to save him[.] Otherwise he'd dead anyway, once he's dropped what he has. If HRC wins, Assange can kiss his life away. Interesting gambit Assange has to play out. He's called Podesta's bluff and raised him the election."

15

61.     On or about November 1, 2016, ██████████, using the **Target Account**, emailed CORSI and STONE with the subject: "Turkey is a 'GO' – FULL GREEN LIGHT." ███████ wrote: "My good friend Husyein will be caking [sic] you he is in the Presidents office. The call is a go. He has all the information you and DJT need for an article and another October surprise." CORSI emailed back to the **Target Account** and STONE: "And I have everything in progress for a phone call tomorrow with DJT.  I'm working with Roger Stone to accomplish this — Roger is copied above so he is up to date on status."

62.     On or about November 2, 2016 ██████████, using the **Target Account**, wrote to STONE and CORSI: "The message from President Erdogan has been sent to you for DJT has just been sent wrapped in an article about baseball as header. If there is a response please let me know."

63.     On or about November 13, 2016, ██████████, using the **Target Account**, emailed Stone. ██████████ wrote, "Well, we did it and now have an opportunity of a lifetime to take the country back. God is good and we are well placed to steer things well. You deserve a lot of credit and working with you and Jeri Corsi, who is with me now in London has been a great joy."

64.     On or about January 7, 2017, ██████████ emailed STONE, and ██████████ (using the **Target Account**) with the subject line, "in case you need his mail........." Attached to the message was a scan of a business card for John Podesta.  Several hours later ██████████, using the **Target Account**, replied to all recipients, "Ha... maybe he wants to go phishing with us?"

65.     I know from my training and experience that the term "phishing" is used to refer to the practice of sending emails purporting to be from a reputable party in order to induce

16

individuals to reveal personal information, including passwords. Public reports indicate that Podesta's emails were obtaining through a "phishing" scheme.

### E. ██████████ Use of the Target Account to Communicate with Other Campaign Officials

66.     According to documents produced by the Campaign (both voluntarily ██ ██████████ ███████ ) ██████ has used the **Target Account** to correspond with individuals throughout the Campaign. For example, on or about October 23, 2015, ████████, using the **Target Account**, emailed ██ ██████ ██████████████ █████ stated that "[it] was so good talking to you earlier in the week — it has sustained me all week. Thank you for your contribution to this campaign and to our great country. I look forward to working with you on a host of things."

67.     On or about February 28, 2016, ████████, using the **Target Account**, emailed ██████ █████████ █████████, with the subject line "Trump on Putin." The text of the message read: "Pass this to Donald," and contained an article by CORSI about how Putin "fear[ed] impact on his plans if Trump takes victory."

68.     On or about April 4, 2016, ████████, ██████ ████ █████ █████ ██████ to introduce an individual who was interested in working with the Trump Campaign.

69.     On or about May 25, 2016, ███████ emailed the **Target Account** about a book he was "toying with the idea of writing." ████████ wrote back noting that, "Roger Stone is getting me on the list to go to Cleveland [the site of the Republican National Convention]."

70.     On or about August 30, 106 ████████, using the **Target Account**, emailed Steve BANNON to report that he had been writing "op-eds" and strategy pieces, "laboring non stop for the Trump campaign even though I am all the way over here in Oxford." ████████

wrote that he had been "in constant touch with the campaign, Roger Stone, and Jeri Corsi."

████████ suggested a "clever idea for . . . the first debate." In his idea, then-candidate Trump

would present then-candidate Clinton with a "Writ of Indictment," for "undeniable crimes

against America, destruction of evidence in the form of mails, and theft of funds to your own

personal benefit and enrichment."

71.     On or about October 25, 2016, ████████, using the **Target Account**, emailed

 regarding a piece ████████ had written about how

████ ██ ███ ███

## BACKGROUND CONCERNING EMAIL

72.     In my training and experience, I have learned that the Providers provide a variety

of on-line services, including electronic mail ("email") and search engines (in the case of Google

and Yahoo), to the public. The Providers allow subscribers to obtain email accounts at the

domain names identified in the email addresses contained in Attachment A. Subscribers obtain

an account by registering with the Providers. During the registration process, the Providers ask

subscribers to provide basic personal information. Therefore, the computers of the Providers are

likely to contain stored electronic communications (including retrieved and unretrieved email)

for their subscribers and information concerning subscribers and their use of services, such as

account access information, email transaction information, and account application information.

In my training and experience, such information may constitute evidence of the crimes under

investigation because the information can be used to identify the account's user or users.

73.     In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account. Such

information can include the subscriber's full name, physical address, telephone numbers and

18

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number). In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users. Based on my training and my experience, I

know that, even if subscribers insert false information to conceal their identity, this information

often provides clues to their identity, location, or illicit activities.

74.      In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems. This

information can include the date on which the account was created, the length of service, records

of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage

of the account. In addition, email providers often have records of the Internet Protocol address

("IP address") used to register the account and the IP addresses associated with particular logins

to the account. Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access

the email account.

75.      In my training and experience, in some cases, email account users will

communicate directly with an email service provider about issues relating to the account, such as

technical problems, billing inquiries, or complaints from other users. Email providers typically

retain records about such communications, including records of contacts between the user and

the provider's support services, as well as records of any actions taken by the provider or user as

a result of the communications. In my training and experience, such information may constitute

19

evidence of the crimes under investigation because the information can be used to identify the account's user or users.

76.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*,

communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

77.    In my training and experience, information such as search history can help to show the state of mind of an individual at the time the search was made, as well as the individuals potential advance knowledge of events, as they search to see if the anticipated event has occurred.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

78.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) associated with the account in Attachment A and particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachments B, government-authorized persons will review that information to locate the items described in Section II of Attachment B. The items identified in Attachments A will also be screened by reviewers not on the prosecution team to identify and filter out privileged material.

## CONCLUSION

79.    STONE instructed CORSI to "Get to Assange" at the Ecuadorian Embassy regarding upcoming leaks. STONE then instructed CORSI to have ▮▮▮▮▮▮▮ (the user of the **Target Account**) talk to ASSANGE. CORSI subsequently emailed STONE that "word is friend in embassy [ASSANGE] plans 2 more dumps.  One shortly after I'm back. 2nd in October. Impact planned to be very damaging…. Time to let more than Podesta to be exposed as in bed w enemy if they are not ready to drop HRC."  Two releases, one from Guccifer and the other from

21

WikiLeaks, occurred at the times predicted by CORSI. CORSI later emailed STONE "talking points" about Podesta.  In January, ███████ (using the **Target Account**), STONE, and CORSI received an email from an individual regarding Podesta, and ███████ wrote back, using the **Target Account**, "Ha… maybe he wants to go phishing with us?"

80.    Based on the forgoing, I request that the Court issue the proposed search warrant.

81.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

<u>**REQUEST FOR SEALING**</u>

82.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the full nature and extent of which is not known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Amy E. Anderson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 19th day of December, 2017.

The Honorable Beryl A. Howell
Chief United States District Judge

## ATTACHMENT A

This warrant applies to information associated with the following Google account:

1. ██████████████

that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a business

with offices located at 1600 Amphitheatre Parkway, Mountain View, CA  94043.

23

## ATTACHMENT B

### Particular Things to be Seized

I.     **Files and Accounts to be produced by the Provider:**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to the Provider or have been preserved pursuant to a preservation request under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all e-mails, attachments and chat messages stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All existing printouts from original storage of all of the electronic mail described above in Section I.A. above;

c.     All internet search data including all queries and location data;

d.     All transactional information of all activity of the account described above in Section I.A, including log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

e.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

f.     All records or other information regarding the identification of the account described above in Section I.A, to include application, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all screen names associated with subscribers and/or accounts, all account names associated with the subscriber, methods of connecting, log files, means and source of payment (including any credit or bank account number), and detailed billing records;

g.     All records indicating the services available to subscribers of the electronic mail address described above in Section I.A.;

II.    **Information to be Seized by Law Enforcement Personnel**

a.    Any and all records that relate in any way to the account described in Attachment A
which consists of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1030
(fraud and related activities in connection with computers), 52 U.S.C. § 30121 (foreign
contribution ban), 18 U.S.C. § 371 (conspiracy to commit an offense against the United
States), and 18 U.S.C. § 2 (aiding and abetting) for the period from January 1, 2015 to the
present, including:

     a.    All records, information, documents or tangible materials that relate in any
way to communications regarding hacking, release of hacked material, communications
with persons or entities associated with WikiLeaks, including but not limited to Julian
Assange;

     b.    All records, information, documents or tangible materials that relate in any
way to communications or meetings between ████████ ████████, Jerome Corsi, Roger
Stone, and individuals associate with WikiLeaks or Turkey;

     b.    All images, messages, communications, calendar entries, search terms,
and contacts, including any and all preparatory steps taken in furtherance of the above-
listed offenses;

     c.    Communication, information, documentation and records relating to who
created, used, or communicated with the account or identifier, including records about
their identities and whereabouts;

     d.    Evidence of the times the account was used;

     e.    All images, messages and communications regarding wiping software,
encryption or other methods to avoid detection by law enforcement;

     f.    Passwords and encryption keys, and other access information that may be
necessary to access the account and other associated accounts;

     g.    Credit card and other financial information, including but not limited to,
bills and payment records evidencing ownership of the subject account;

     h.    All existing printouts from original storage which concern the categories
identified in subsection II.A; and

     i.    All "address books" or other lists of contacts.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH

██████████████████

Case: 1:17-mj-00982
Assigned To : Howell, Beryl A.
Assign. Date : 12/19/2017
Description: Search and Seizure Warrant

MOTION TO SEAL WARRANT AND RELATED DOCUMENTS AND
TO REQUIRE NON-DISCLOSURE UNDER 18 U.S.C. § 2705(b)

The United States of America, moving by and through its undersigned counsel, respectfully

moves the Court for an Order placing the above-captioned warrant and the application and affidavit

in support thereof (collectively herein the "Warrant") under seal, and precluding the provider from

notifying any person of the Warrant pursuant to 18 U.S.C. § 2705(b). In regard to the non-

disclosure, the proposed Order would direct Google, an electronic communication and/or remote

computing services provider headquartered in Mountain View, California not to notify any other

person (except attorneys for Google for the purpose of receiving legal advice) of the existence or

content of the Warrant for a period of one year or until further order of the Court.

JURISDICTION AND LEGAL BACKGROUND

1.      The Court has the inherent power to seal court filings when appropriate,

including the Warrant. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)). The Court may also seal the

Warrant to prevent serious jeopardy to an ongoing criminal investigation when, as in the present

case, such jeopardy creates a compelling governmental interest in preserving the confidentiality of

the Warrant. *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991).

2.      In addition, this Court has jurisdiction to issue the requested order because it is "a

court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is a

"district court of the United States . . . that – has jurisdiction over the offense being investigated."

18 U.S.C. § 2711(3)(A)(i).  As discussed fully below, acts or omissions in furtherance of the offense under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

3.      Further, the Court has authority to require non-disclosure of the Warrant under 18 U.S.C. § 2705(b).   Google provides an "electronic communications service," as defined in 18 U.S.C. § 2510(15), and/or "remote computing service," as defined in 18 U.S.C. § 2711(2).   The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, governs how Google may be compelled to supply communications and other records using a subpoena, court order, or search warrant.   Specifically, Section 2703(c)(2) authorizes the Government to obtain certain basic "subscriber information" using a subpoena, Section 2703(d) allows the Government to obtain other "non-content" information using a court order, and Section 2703(a)-(b)(1)(A) allows the Government to obtain contents of communications using a search warrant.  *See* 18 U.S.C. § 2703.

4.      The SCA does not set forth any obligation for providers to notify subscribers about subpoenas, court orders, or search warrants under Section 2703.   However, many have voluntarily adopted policies of notifying subscribers about such legal requests.   Accordingly, when necessary, Section 2705(b) of the SCA enables the Government to obtain a court order to preclude such notification.  In relevant part, Section 2705(b) provides as follows:[1]

> (b) Preclusion of notice to subject of governmental access. — A governmental entity acting under section 2703 . . . may apply to a court for an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order.  The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—
> (1) endangering the life or physical safety of an individual;
> (2) flight from prosecution;

---

[1] Section 2705(b) contains additional requirements for legal process obtained pursuant to 18 U.S.C. § 2703(b)(1)(B), but the Government does not seek to use the proposed Order for any legal process under that provision.

2

(3) destruction of or tampering with evidence;

(4) intimidation of potential witnesses; or

(5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

18 U.S.C. § 2705(b). The United States District Court for the District of Columbia has made clear that a nondisclosure order under Section 2705(b) must be issued once the Government makes the requisite showing about potential consequences of notification:

> The explicit terms of section 2705(b) make clear that if a courts [*sic*] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate. Once the government makes the required showing under § 2705(b), the court is required to issue the non-disclosure order.

*In re Application for Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena #GJ2014031422765*, 41 F. Supp. 3d 1, 5 (D.D.C. 2014).

5.      Accordingly, this motion to seal sets forth facts showing reasonable grounds to command Google not to notify any other person (except attorneys for Google for the purpose of receiving legal advice) of the existence of the Subpoena for a period of one year or until further order of the Court.

<u>FACTS SUPPORTING SEALING AND NON-DISCLOSURE</u>

6.      At the present time, law enforcement officers of the FBI are conducting an investigation into violations related to 18 U.S.C. § 1030 (fraud and related activities in connection with computers), 52 U.S.C. § 30121 (foreign contribution ban), 18 U.S.C. § 371 (conspiracy to commit an offense against the United States), and 18 U.S.C. § 2 (aiding and abetting), arising out of the conduct of Roger Stone, ███████ ███████, and others. The investigation in ongoing, and individuals associated with these offenses are not aware of the investigation. If they are made aware of the existence and contents of this search warrant, they may seek to delete additional information contained in online platforms or otherwise destroy records related to the investigation.

3

REQUEST FOR SEALING AND NON-DISCLOSURE

7.      In this matter, the government requests that the Warrant be sealed until further order of the Court and that Google and its employees be directed not to notify any other person of the existence or content of the Warrant (except attorneys for Google for the purpose of receiving legal advice) for a period of one year or until further order of the Court.  Such an order is appropriate because the Warrant relates to an ongoing criminal investigation, the full scope of which is neither public nor known to the targets of the investigation, and its disclosure may alert these targets to the ongoing investigation and its scope.  Once alerted to this investigation, potential targets would be immediately prompted to destroy or conceal incriminating evidence, alter their operational tactics to avoid future detection, and otherwise take steps to undermine the investigation and avoid future prosecution.  In particular, given that they are known to use electronic communication and remote computing services, the potential target could quickly and easily destroy or encrypt digital evidence relating to their criminal activity.

8.      Given the complex and sensitive nature of the criminal activity under investigation, and also given that the criminal scheme may be ongoing, the Government anticipates that this confidential investigation will continue for the next year or longer.   However, should circumstances change such that court-ordered nondisclosure under Section 2705(b) becomes no longer needed, the Government will notify the Court and seek appropriate relief.

9.      There is, therefore, reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C. § 2705(b)(2)-(5).  Because of such potential jeopardy to the investigation, there also exists a

compelling governmental interest in confidentiality to justify the government's sealing request. *See Robinson*, 935 F.2d at 287-89.

10.     Based on prior dealings with Google the United States is aware that, absent a court order under Section 2705(b) commanding Google not to notify anyone about a legal request, it is Google's policy and practice, upon receipt of a warrant seeking the contents of electronically stored wire or electronic communications for a certain account, to notify the subscriber or customer of the existence of the warrant prior to producing the material sought.


WHEREFORE, for all the foregoing reasons, the government respectfully requests that the above-captioned warrant, the application and affidavit in support thereof, and all attachments thereto and other related materials be placed under seal, and furthermore, that the Court command Google not to notify any other person of the existence or contents of the above-captioned warrant (except attorneys for Google for the purpose of receiving legal advice) for a period of one year or until further order of the Court.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: 12/19/2017

By: _____
Aaron S.J. Zelinsky
The Special Counsel's Office
(202)-514-0637

FILED

DEC 1 9 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
███████████████

Case: 1:17-mj-00982
Assigned To : Howell, Beryl A.
Assign. Date : 12/19/2017
Description: Search and Seizure Warrant

## ORDER

The United States has filed a motion to seal the above-captioned warrant and related documents, including the application and affidavit in support thereof (collectively the "Warrant"), and to require Google, an electronic communication and/or remote computing service s headquartered at 1600 Amphitheatre Parkway, Mountain View, California not to disclose the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b).

The Court finds that the United States has established that a compelling governmental interest exists to justify the requested sealing, and that there is reason to believe that notification of the existence of the Warrant will seriously jeopardize the investigation, including by giving the targets an opportunity to flee from prosecution, destroy or tamper with evidence, and intimidate witnesses. *See* 18 U.S.C. § 2705(b)(2)-(5).

**IT IS THEREFORE ORDERED** that the motion is hereby **GRANTED**, and that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant motion to seal, and this Order be **SEALED** until further order of the Court; and

**IT IS FURTHER ORDERED** that, pursuant to 18 U.S.C. § 2705(b), Google and its employees shall not disclose the existence or content of the Warrant to any other person (except attorneys for Google for the purpose of receiving legal advice) for a period of one year or until further order of the Court.

THE HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE

12/19/2019
Date

2