AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH THREE<br>ACCOUNTS STORED AT PREMISES<br>CONTROLLED BY FACEBOOK | Case: 1:18-sc-02570<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 8/2/2018<br>Description: Search & Seizure Warrant |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 15, 2018 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Beryl A. Howell, Chief U.S. District Judge _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     8/2/2018 at 2:55PM                    *Judge's signature*

City and state:     Washington, DC                    Hon. Beryl A. Howell, Chief U.S. District Judge
                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return |
|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : |
| Inventory of the property taken and name of any person(s) seized: |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Facebook accounts, which are stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a company headquartered at 1 Hacker Way, Menlo Park, California 94025:



## ATTACHMENT B

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All records relating to machine cookies;

(g)     All "check ins" and other location information, including records of the user's latitude and longitude;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     Group identification numbers; a list of users currently registered to the group; a list of users who like the page; group or page contact information, including all contact information for the creator and/or administrator of the group and a PDF of the current status of the group profile page;

(q)     All past and present Admins for the group;

(r)     The "Creator" of the group;

(s)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(t)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

(u)     All records related to advertisements and advertising conducted through the accounts, including advertisements purchased, advertising parameters (search terms, groups, geographic areas) selected and queried.

## II.     Information to be Seized by the Government

Any and all records that relate in any way to the accounts described in Attachment A which consists of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1030 (unauthorized access of a protected computer); 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (attempt and conspiracy to commit wire fraud), and 52 U.S.C. § 30121 (foreign contributions ban) for the period from June 2015 to the present, including:

a.     All records, information, documents or tangible materials that relate in any way to communications regarding hacking, release of hacked material, communications with persons or entities associated with WikiLeaks, including but not limited to Julian Assange, or communications regarding disinformation, denial, dissembling or other obfuscation about knowledge of, or access to, hacked material;

-4-

b.   All records, information, documents or tangible materials that relate in any way to communications or meetings involving Roger Stone, ▓▓▓▓▓▓▓▓▓ Jerome Corsi, Julian Assange, and individual associated with WikiLeaks and/or with the Trump Campaign;

c.   Communications, records, documents, and other files related to any expenditure, independent expenditure, or disbursement for an electioneering communication;

d.   Records of any funds or benefits disbursed by or offered on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.   Communications, records, documents, and other files that reveal efforts by any person to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

f.   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g.   Evidence indicating the account user's state of mind as it relates to the crimes under investigation;

h.   The source of all funds used to purchase advertisements or make other expenditures or disbursements in these accounts;

i.   The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

j.     The identity of any non-U.S. person(s)—including records that help reveal the whereabouts of the person(s)—who made any expenditure, independent expenditure, or disbursement for an electioneering communication; and

k.     The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

# UNITED STATES DISTRICT COURT

for the

District of Columbia



**FILED**

AUG - 2 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH THREE ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY FACEBOOK | )<br>)<br>)<br>)<br>)<br>) | Case: 1:18-sc-02570<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 8/2/2018<br>Description: Search & Seizure Warrant |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2, 3, 4, 371 | Aiding & Abetting, Accessory after the Fact, Misprision of a Felony, Conspiracy |
| 18 U.S.C. §§ 1030, 1343, 1349 | Unauthorized Access of Protected Computer, Wire Fraud, Wire Fraud Conspiracy |
| 52 U.S.C. § 30121 | Foreign Contribution Ban |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA/SAUSA:

| |
|---|
| Kyle R. Freeny (ASC) |

Andrew Mitchell,   Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/2/2018

_____
*Judge's signature*

City and state:  Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

FILED

AUG - 2 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THREE FACEBOOK ACCOUNTS
STORED AT PREMISES CONTROLLED
BY FACEBOOK, INC.

Case: 1:18−sc−02570
Assigned To : Howell, Beryl A.
Assign. Date : 8/2/2018
Description: Search & Seizure Warrant

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Mitchell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with the Facebook accounts associated with the following user IDs:



which are stored at premises owned, maintained, controlled or operated by Facebook Inc., a social

networking company headquartered in Menlo Park, California ("Facebook").  The information to

be disclosed by Facebook and searched by the government is described in the following paragraphs

and in Attachments A and B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have

been since 2011.  As a Special Agent of the FBI, I have received training and experience in

investigating criminal and national security matters.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other FBI personnel and witnesses. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **Target Accounts** contain evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18 U.S.C. § 1030 (unauthorized access of a protected computer), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1349 (attempt and conspiracy to commit wire fraud), and 52 U.S.C. § 30121(a)(1)(C) (foreign expenditure ban).  There also is probable cause to search the information described in Attachment A for evidence, contraband, fruits, and/or instrumentalities of the Subject Offenses, further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *Id.* §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  The offense conduct included activities in Washington, D.C., as detailed below.

## PROBABLE CAUSE

**A. Background on Relevant Individuals**

i. *Roger STONE*

6.      Roger STONE is a self-employed political strategist/consultant and has been actively involved in U.S. politics for decades.  STONE worked on the presidential campaign of Donald J. Trump (the "Campaign") until August 2015.  Although Stone had no official

relationship with the Campaign thereafter, STONE maintained his support for Trump and continued to make media appearances in support of Trump's presidential campaign. As described further below, STONE also maintained contact with individuals employed by the Campaign, including then-campaign chairman Paul MANAFORT and deputy chairman Rick GATES.

        **ii.** *Jerome CORSI*

      7.     Jerome CORSI is a political commentator who, according to publicly available information, currently serves as the "Washington Bureau Chief for Inforwars.com." According to publicly-available sources, from 2014 until January 2017, CORSI was a "senior staff reporter" for the website "World Net Daily" a/k/a "WND.com." CORSI has also written a number of books regarding Democratic presidential candidates. As described further below, CORSI was in contact with STONE during the summer and fall of 2016 regarding forthcoming disclosures of hacked information by WikiLeaks, and appears to have obtained information regarding upcoming disclosures which he relayed to STONE.



**B.     Russian Government-Backed Hacking Activity During the 2016 Presidential Election**

9.      On January 6, 2017, the USIC released a declassified version of an intelligence assessment of Russian activities and intentions during the 2016 presidential election entitled, "Assessing Russian Activities and Intentions in Recent US Elections."  In the report, the USIC assessed the following:

> [] Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election. Russia's goals were to undermine public faith in the US democratic process, denigrate [former] Secretary [of State Hillary] Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump.

10.     In its assessment, the USIC also described, at a high level, some of the techniques that the Russian government employed during its interference. The USIC summarized the efforts as a "Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or 'trolls.'"

11.     With respect to "cyber activity," the USIC assessed that "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties." Further, "[i]n July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016." The USIC attributed these cyber activities to the Russian GRU, also known as the Main Intelligence Directorate: "GRU operations resulted

in the compromise of the personal e-mail accounts of Democratic Party officials and political figures. By May, the GRU had exfiltrated large volumes of data from the DNC."

12.     With respect to the release of stolen materials, the USIC assessed "with high confidence that the GRU used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."

13.     Guccifer 2.0, who claimed to be an independent Romanian hacker, made multiple contradictory statements and false claims about his identity throughout the election.

14.     The Special Counsel's Office has determined that individuals associated with the GRU continued to engage in hacking activity related to the 2016 presidential election through at least November 1, 2016.

15.     For example, in or around September 2016, these individuals successfully gained access to DNC computers housed on a third-party cloud-computing service.  In or around late September, these individuals stole data from these cloud-based computers by creating backups of the DNC's cloud-based systems using the cloud provider's own technology.  The individuals used three new accounts with the same cloud computing service to move the "snapshots" to those accounts.

16.     On or about September 4, 2016, individuals associated with the GRU stole the emails from a former White House advisor who was then advising the Clinton Campaign.  These emails were later post on DCLeaks.

17.     On or about November 1, 2016, individuals associated with the GRU spearphished over 100 accounts used by organizations and personnel involved in administering elections in numerous Florida counties.

18.     On July 13, 2018, a grand jury in the District of Columbia returned an indictment against twelve Russia military officers for criminal offenses related to efforts to influence the 2016 presidential election, including conspiracy to commit authorized access to protected computers. (Case No. 1:18-cr-00125).

**C. STONE's Public Interactions with Guccifer 2.0 and WikiLeaks**

19.     On June 14, 2016, CrowdStrike, the forensic firm that sought to remediate an unauthorized intrusion into the computer systems of the DNC, publicly attributed the hack to Russian government actors and the media reported on the announcement. On June 15, 2016, the persona Guccifer 2.0 appeared and publicly claimed responsibility for the DNC hack.  It stated on its WordPress blog that, with respect to the documents stolen from the DNC, "[t]he main part of the papers, thousands of files and mails, I gave to Wikileaks.  They will publish them soon." In that post, Guccifer 2.0 also began releasing hacked DNC documents.

20.     On July 22, 2016, WikiLeaks published approximately 20,000 emails stolen from the DNC.

21.     On August 5, 2016, STONE published an article on Breitbart.com entitled, "Dear Hillary: DNC Hack Solved, So Now Stop Blaming Russia." The article stated:  "It doesn't seem to be the Russians that hacked the DNC, but instead a hacker who goes by the name of Guccifer 2.0." The article contained embedded publicly available Tweets from Guccifer 2.0 in the article and stated: "Here's Guccifer 2.0's website. Have a look and you'll see he explains who he is and why he did the hack of the DNC." The article also stated: "Guccifer 2.0 made a fateful and wise decision. He went to WikiLeaks with the DNC files and the rest is history. Now the world would see for themselves how the Democrats had rigged the game."

22.     On August 8, 2016, STONE addressed the Southwest Broward Republican

Organization.  During his speech, he was asked about a statement by WikiLeaks founder Julian
ASSANGE to Russia Today (RT) several days earlier about an upcoming "October Surprise"
aimed at the Hillary Clinton presidential campaign.  Specifically, Stone was asked: "With regard
to the October surprise, what would be your forecast on that given what Julian Assange has
intimated he's going to do?"  STONE responded: "Well, it could be any number of things.  I
actually have communicated with ASSANGE.  I believe the next tranche of his documents
pertain to the Clinton Foundation but there's no telling what the October surprise may be."  A
few days later, STONE clarified that while he was not personally in touch with ASSANGE, he
had a close friend who served as an intermediary.

23.      On August 12, 2016, Guccifer 2.0 publicly tweeted: "@RogerJStoneJr thanks that
u believe in the real #Guccifer2."  That same day, Guccifer 2.0 released the personal cellphone
numbers and email addresses from the files of the DCCC.

24.      On August 13, 2016, STONE posted a tweet using @RogerJStoneJr calling
Guccifer 2.0 a "HERO" after Guccifer 2.0 had been banned from Twitter.  The next day,
Guccifer 2.0's Twitter account was reinstated.

25.      On August 17, 2016, Guccifer 2.0 publicly tweeted, "@RogerJStoneJr paying you
back." Guccifer also sent a private message to @RogerJStoneJr stating "i'm pleased to say u r
great man. please tell me if I can help u anyhow. it would be a great pleasure to me."

26.      On August 18, 2016, Paul MANAFORT, STONE's longtime friend and associate,
resigned as Chairman of the Trump Campaign.  Contemporary press reports at the time indicated
that MANAFORT had worked with a Washington D.C.-based lobbying firms to influence U.S.
policy toward Ukraine.

27.      On August 21, 2016, using @RogerJStoneJR, STONE tweeted stating: "Trust me,

it will soon the [sic] Podesta's time in the barrel. #CrookedHillary."   In a C-SPAN interview that same day, STONE reiterated that because of the work of a "'mutual acquaintance' of both his and [Assange], the public [could] expect to see much more from the exiled whistleblower in the form of strategically-dumped Clinton email batches."   He added: "Well, first of all, I think Julian Assange is a hero… I think he's taking on the deep state, both Republican and Democrat. I believe that he is in possession of all of those emails that Huma Abedin and Cheryl Mills, the Clinton aides, believe they deleted.  That and a lot more.  These are like the Watergate tapes."

28.     On September 16, 2016, STONE said in a radio interview with Boston Herald Radio that he expected WikiLeaks to "drop a payload of new documents on Hillary on a weekly basis fairly soon. And that of course will answer the question as to what exactly what was erased on that email server."

29.     On Saturday, October 1, 2016, using @RogerJStoneJr, STONE tweeted, "Wednesday @ HillaryClinton is done. #WikiLeaks."

30.     On Sunday, October 2, 2016, MSNBC Morning Joe producer Jesse Rodriquez tweeted regarding an announcement ASSANGE had scheduled for the next day from the balcony of the Ecuadoran Embassy in London.  On the day of the ASSANGE announcement – which was part of WikiLeaks' 10-year anniversary celebration – STONE told Infowars that his intermediary described this release as the "mother load." On October 5, 2016, STONE used @RogerJStoneJr to tweet: "Payload coming. #Lockthemup."

31.     On Friday, October 7, 2016, at approximately 4:03 PM, the Washington Post published an article containing a recorded conversation from a 2005 Access Hollywood shoot in which Mr. Trump had made a series of lewd remarks.

32.     Approximately a half hour later, at 4:32 PM, WikiLeaks sent a Tweet reading

"RELEASE: The Podesta Emails #HillaryClinton #Podesta #imWithHer" and containing a link to approximately 2,050 emails that had been hacked from John Podesta's personal email account.

33.    WikiLeaks continued to release John Podesta's hacked emails through Election Day, November 8, 2016. On October 12, 2016, John Podesta – referring back to STONE's August 21, 2016 C-SPAN and Twitter references – argued publicly that "[it is] a reasonable assumption to - or at least a reasonable conclusion - that [STONE] had advanced warning [of the release of his emails] and the Trump campaign had advanced warning about what Assange was going to do. I think there's at least a reasonable belief that [Assange] may have passed this information on to [STONE]." Commenting to the NBC News, STONE indicated that he had never met or spoken with Assange, saying that "we have a mutual friend who's traveled to London several times, and everything I know is through that channel of communications. I'm not implying I have any influence with him or that I have advanced knowledge of the specifics of what he is going to do. I do believe he has all of the e-mails that Huma Abedin and Cheryl Mills, the Clinton aides, thought were deleted. I hear that through my emissary."

34.    On March 27, 2017, CNN reported that a representative of WikiLeaks, writing from an email address associated with WikiLeaks, denied that there was any backchannel communication during the Campaign between STONE and WikiLeaks. The same article quoted STONE as stating: "Since I never communicated with WikiLeaks, I guess I must be innocent of charges I knew about the hacking of Podesta's email (speculation and conjecture) and the timing or scope of their subsequent disclosures. So I am clairvoyant or just a good guesser because the limited things I did predict (Oct disclosures) all came true."

## D. STONE's Private Twitter Direct Messages with WikiLeaks and ASSANGE

35.    On October 13, 2016, while WikiLeaks was in the midst of releasing the hacked

Podesta emails, the Twitter account @RogerJStoneJr sent a private direct message to the Twitter account @wikileaks.[1] The latter account is the official Twitter account of WikiLeaks and has been described as such by numerous news reports. The message read: "Since I was all over national TV, cable and print defending WikiLeaks and assange against the claim that you are Russian agents and debunking the false charges of sexual assault as trumped up bs you may want to rexamine the strategy of attacking me- cordially R."

36.     Less than an hour later, @wikileaks responded by direct message: "We appreciate that. However, the false claims of association are being used by the democrats to undermine the impact of our publications. Don't go there if you don't want us to correct you."

37.     On or about October 15, 2016, @RogerJStoneJr sent a direct message to @wikileaks: "Ha! The more you \"correct\" me the more people think you're lying. Your operation leaks like a sieve. You need to figure out who your friends are."

38.     On or about November 9, 2016, one day after the presidential election, @wikileaks sent a direct message to @RogerJStoneJr containing a single word: "Happy?" @wikileaks immediately followed up with another message less than a minute later: "We are now more free to communicate."

39.     In addition, @RogerJStoneJr also exchanged direct messages with ASSANGE, the founder of WikiLeaks. For example, on June 4, 2017, @RogerJStoneJr directly messaged @JulianAssange, an address associated with Julian Assange in numerous public reports, stating: "Still nonsense. As a journalist it doesn't matter where you get information only that it is accurate and authentic. The New York Times printed the Pentagon Papers which were indisputably stolen

---

[1] On or about August 7, 2017, Chief Judge Beryl A. Howell issued a search warrant for the Twitter account @RogerJStoneJr.

from the government and the courts ruled it was legal to do so and refused to issue an order

restraining the paper from publishing additional articles. If the US government moves on you I

will bring down the entire house of cards. With the trumped-up sexual assault charges dropped I

don't know of any crime you need to be pardoned for - best regards. R."  That same day,

@JulianAssange responded: "Between CIA and DoJ they're doing quite a lot. On the DoJ side

that's coming most strongly from those obsessed with taking down Trump trying to squeeze us

into a deal."

40.     On Saturday, June 10, 2017, @RogerJStoneJr sent a direct message to

@wikileaks, reading: "I am doing everything possible to address the issues at the highest level of

Government. Fed treatment of you and WikiLeaks is an outrage. Must be circumspect in this

forum as experience demonstrates it is monitored. Best regards R."

### E.  CORSI's Communications with STONE, ████████ and Others Regarding Forthcoming Leaks

41.     On September 11, 2017, Chief Judge Beryl A. Howell of the District of Columbia

issued a search warrant for STONE's ████ address, ████████████ On October

17, 2017, Chief Judge Beryl A. Howell issued a search warrant for one of STONE's ████

addresses. ████████████ .  On or about December 19, 2017, Chief Judge Beryl A.

Howell issued a search warrant for ████████ email account. On or about March 14, 2018,

Chief Judge Beryl A. Howell issued a search warrant for STONE's iCloud account. Information

recovered pursuant to those search warrants indicated the following:

42.     On or about May 15, 2016, ████████ emailed CORSI: "Here is my flight

schedule. Need to get something confirmed now . . . ."  CORSI responded, "I copied Roger

Stone so he knows your availability to meet Manafort and DT this coming week." CORSI

appears to have forwarded the message to STONE at ██████████████ who replied to

CORSI that, "May meet Manafort -guarantee nothing."

     43.     On or about May 18, 2016, CORSI emailed STONE at ████████████████

with the title, "Roger -- why don't you look this over before I send it ██████ I believe that

████████████████████████████████████████████████████████ CORSI wrote,

████████████████████ and I did manage to see Mr. Trump for a few minutes today as we were

waiting in Trump Tower to say hello to Mike Cohen. Mr. Trump recognized us immediately and

was very cordial. He would look for this memo from you this afternoon."

     44.     On July 25, 2016, STONE, using ██████████████, sent an email to

CORSI with the subject line, "Get to Assange."  The body of the message read: "Get to Assange

[a]t Ecuadorian Embassy in London and get the pending WikiLeaks emails…they deal with

Foundation, allegedly."

     45.     On or about July 31, 2016, STONE, using ████████████████, emailed

CORSI with the subject line, "Call me MON."  The body of the email read: "██████ should see

Assange[.] ██████ should find Bernie [S]anders brother who called Bill a Rapist – turn him for

Trump[.] ██████ should find ████████████████ or more proof of Bill getting kicked out."

     46.     On or about August 2, 2016 (approximately 19 days before STONE publicly

tweeted about "Podesta's time in the barrel"), CORSI emailed STONE at

██████████████████ "Word is friend in embassy plans 2 more dumps. One shortly after I'm

back. 2nd in Oct. Impact planned to be very damaging. Signs are Fox will have me on mid-Aug.

more post Ailes shakeup underway. Expect Shine to surface victor, for now. Post-DNC bump for

HRC an artifact of rigged polling. Won't last. I expect presidential campaign to get serious

starting Sept. Still in pre-season games. Time to let more than Podesta to be exposed as in bed w

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.
Would not hurt to start suggesting HRC old, memory bad, has stroke -- neither he nor she well. I
expect that much of next dump focus, setting stage for Foundation debacle." Investigators
believe that CORSI's reference to a "friend in embassy [who] plans 2 more dumps" refers to
Julian ASSANGE, the founder of WikiLeaks, who resided in Ecuador's London Embassy in
2016.

      47.    On or about August 5, 2016, ███████████ an associate of STONE's, emailed
STONE at ████████████ The email contained a link to a poll indicating that Clinton
led Trump by 15 points.  STONE responded "enjoy it while u can[.] I dined with my new pal
Julian Assange last night." ██████████ subsequently stated to investigators that, around the
same time, STONE told him he had gone to London to meet ASSANGE. ██████████ also stated
that in 2018, █████████ told STONE he would be interviewed by the FBI and would have to
divulge the conversation about meeting ASSANGE. STONE told █████████ he was joking and
had not actually met ASSANGE.

      48.    On or about August 15, 2016, CORSI emailed STONE at
█████████████ : "Give me a call today if you can. Despite MSM drumroll that HRC is
already elected, it's not over yet. More to come than anyone realizes. Won't really get started
until after Labor Day. I'm in NYC this week. Jerry."

      49.    On or about August 31, 2016, CORSI emailed STONE at
█████████████ : "Did you get the PODESTA writeup." STONE replied "yes."

      50.    On or about August 31, 2016, CORSI messaged STONE, "Podesta paid $180k to
invest in Uranium One -- was hired by Rosatom in Giustra scandal. Podesta now under FBI
investigation -- tied to Ukraine Yanukovych -- Panama papers reveals Podesta hired by

S[b]erbank, Russia's largest financial institution – Podesta $$$ ties to Russia undermine Clinton false narrative attempting to tie Trump to Putin."

51.     On or about September 6, 2016, CORSI emailed STONE at ███████████████ : "Roger[,] Is NY Post going to use the Pedesta [sic] stuff?"

52.     On or about September 24, 2016, ███████ emailed CORSI, "I will have much more on Turkey. Need a back channel highly sensitive stuff." CORSI responded, "We have secure back channel through Roger. I saw him again in NYC last Friday and spoke to him about it again today." ███████ wrote back, "Awaiting secret file. Explosive... Hope you are well. Can't wait for the debate. Channeling Reagan, I hope!" CORSI responded, "Keep me posted about file[.]" In a subsequent meeting with investigators, ███████ indicated this conversation concerned possible derogatory information he was trying to obtain from Turkey.

53.     On or about October 3, 2016, an associate of STONE emailed STONE at ███████████████ and asked: "Assange – what's he got? Hope it's good." STONE wrote back, "It is. I'd tell Bannon but he doesn't call me back. My book on the TRUMP campaign will be out in Jan. Many scores will be settled." The associate forwarded the email to Steve BANNON and wrote: "You should call Roger. See below. You didn't get from me." BANNON wrote back, "I've got important stuff to worry about." The associate responded, "Well clearly he knows what Assange has. I'd say that's important."

54.     On or about October 4, 2016, ASSANGE gave a press conference at the Ecuadorian Embassy. There had been speculation in the press leading up to that event that ASSANGE would release information damaging to then-candidate Clinton, but WikiLeaks did not make any new releases. Instead, ASSANGE promised more documents, including information "affecting three powerful organizations in three different states, as well as, of course,

information previously referred to about the U.S. election process." ASSANGE also stated that

WikiLeaks would publish documents on various subjects every week for the next ten weeks, and

vowed that the U.S. election-related documents would all come out before Election Day.

55.    On or about October 4, 2016, CORSI messaged STONE at his iCloud account:

"Assange made a fool of himself. Has nothing or he would have released it. Total BS hype."

56.    That same day, BANNON emailed STONE at ███████████████ "What was

that this morning???" STONE replied, "Fear. Serious security concern. He thinks they are going

to kill him and the London police are standing done [sic]." BANNON wrote back, "He didn't

cut deal w/ clintons???" Stone replied, "Don't think so BUT his lawyer ██████ is a big

democrat."

57.    When BANNON spoke with investigators during a voluntary proffer on February

14, 2018, he initially denied knowing whether the October 4, 2016 email to STONE was about

WikiLeaks. Upon further questioning, BANNON acknowledged that he was asking STONE

about WikiLeaks, because he had heard that STONE had a channel to ASSANGE, and

BANNON had been hoping for releases of damaging information that morning.

**F. STONE and CORSI Communications on October 7, 2016, when the Podesta Emails Are Released.**

58.    According to a publicly available news article,[2] at approximately 11AM on

Friday, October 7, 2016, Washington Post reporter David Fahrenthold received a phone call from

a source regarding a previously unaired video of candidate Trump. According to the same

article, "Fahrenthold didn't hesitate. Within a few moments of watching an outtake of footage

---

[2] https://www.washingtonpost.com/lifestyle/style/the-caller-had-a-lewd-tape-of-donald-trump-then-the-race-was-on/2016/10/07/31d74714-8ce5-11e6-875e-2c1bfe943b66_story.html

from a 2005 segment on 'Access Hollywood,' the Washington Post reporter was on the phone, calling Trump's campaign, 'Access Hollywood,' and NBC for reaction."

59.     According to phone records ███████████████ at approximately 11:27 AM, CORSI placed a call to STONE, which STONE did not answer.

60.     At approximately 11:53AM, STONE received a phone call from the Washington Post. The call lasted approximately twenty minutes.

61.     At approximately 1:42PM, STONE called CORSI and the two spoke for approximately seventeen minutes.

62.     At approximately 2:18PM, CORSI called STONE and the two spoke for approximately twenty minutes.

63.     At approximately 4:00PM, the Washington Post published a story regarding the Access Hollywood tape.

64.     At approximately 4:30PM, WikiLeaks tweeted out its first release of emails hacked from John Podesta that focused primarily on materials related to the Clinton Foundation. On or about August 2, 2016, when CORSI emailed STONE on ███████████████, he wrote, "I expect that much of next dump focus, setting stage for Foundation debacle."

65.     At approximately 6:27PM, ███████████ sent STONE an email titled, "WikiLeaks – The Podesta Emails," with a link to the newly-released Podesta emails. Approximately ten minutes later, STONE, using ███████████, forwarded ██████ message to CORSI without comment. STONE does not appear to have forwarded the email to any other individual.

### G. STONE Requests to CORSI for "SOMETHING" to Post About Podesta After STONE Is Accused of Advance Knowledge of the Leak

66.     On or about October 8, 2016, STONE messaged CORSI, "Lunch postponed – have to go see T." CORSI responded to STONE, "Ok. I understand." Approximately twenty minutes later, CORSI texted, "Clintons know they will lose a week of Paula Jones media with T attacking Foundation, using Wikileaks Goldman Sachs speech comments, attacking bad job numbers."

67.     On or about Wednesday, October 12, 2016, at approximately 8:17AM, STONE, using ███████████████ emailed Corsi asking him to "send me your best podesta links." STONE emailed CORSI at approximately 8:44AM EDT, "need your BEST podesta pieces." CORSI wrote back at approximately 8:54AM EDT, "Ok. Monday. The remaining stuff on Podesta is complicated. Two articles in length. I can give you in raw form the stuff I got in Russian translated but to write it up so it's easy to understand will take weekend. Your choice?"

68.     On or about that same day, October 12, 2016, Podesta accused STONE of having advance knowledge of the publication of his emails. At approximately 3:25PM EDT, CORSI emailed STONE at both ███████████████████████████, with a subject line "Podesta talking points." Attached to the email was a file labeled, "ROGER STONE podesta talking points Oct 12 2016.docx." The "talking points" included the statement that "Podesta is at the heart of a Russian-government money laundering operation that benefits financially Podesta personally and the Clintons through the Clinton Foundation."

69.     CORSI followed up several minutes later with another email titled, "Podesta talking points," with the text "sent a second time just to be sure you got it." STONE emailed CORSI back via the Hotmail Account, "Got them and used them."

70.     On or about Thursday, October 13, 2016, CORSI emailed STONE at

███████████████: "PODESTA -- Joule & ties to RUSSIA MONEY LAUNDERING to

CLINTON FOUNDATION."  STONE responded, "Nice but I was hoping for a piece I could

post under my by-line since I am the one under attack by Podesta and now Mook."  CORSI

wrote back to STONE, "I'll give you one more — NOBODY YET HAS THIS[:] It looks to me

like ████████skimmed maybe billions off Skolkovo — Skolkovo kept their money with

Metcombank[.] The Russians launched a criminal investigation[.] [web link] Once ████████

had the channel open from Metcombank to Deutsche Bank America to Ban[k] of America's

Clinton Fund account, there's no telling how much money he laundered, or where it ended up.

Nothing in Clinton Foundation audited financials or IRS Form 990s about $$$ received via

Russia & Metcombank[.] I'm working on that angle now."  STONE replied, "Ok Give me

SOMETHING to post on Podesta since I have now promised it to a dozen MSM reporters[.]"

71.     On or about Thursday, October 13, 2016 at approximately 6:30PM EDT, CORSI

sent STONE an email at ███████████████ with the subject, "ROGER STONE article

RUSSIAN MAFIA STYLE MONEY-LAUNDERING, the CLINTON FOUNDATION, and

JOHN PODESTA."  The text stated: "Roger[,] You are free to publish this under your own

name."  That same day, STONE posted a blog post with the title, "Russian Mafia money

laundering, the Clinton Foundation and John Podesta."  In that post, STONE wrote, "although I

have had some back-channel communications with Wikileaks I had no advance notice about the

hacking of Mr. Podesta nor I have I ever received documents or data from Wikileaks."  The post

then asked, "Just how much money did ███████████ a controversial Russian billionaire

investor with ties to the Vladimir Putin and the Russian government, launder through

Metcombank, a Russian regional bank owned 99.978 percent by ████████ with the money

-18-

transferred via Deutsche Bank and Trust Company Americas in New York City, with the money ending up in a private bank account in the Bank of America that is operated by the Clinton Foundation?"

72.     On or about October 14, 2016, CORSI sent a message to STONE at his iCloud account, "I'm in NYC. Thinking about writing piece attacking Leer and other women. It's basically a rewrite of what's out there. Going through new Wikileaks drop on Podesta."

73.     On or about October 17, 2016, CORSI messaged STONE at his iCloud account, "On Assange, can you call me now – before 2pm[.]"  STONE responded, "Missed u – just landed JFK – on Infowars now." CORSI wrote back, "Call afterwards. Have some important intel to share."

74.     On or about October 17, 2016, CORSI emailed STONE at

████████████████████████████████ with the subject, "Fwd: ASSANGE…URGENT…" CORSI wrote, "From a very trusted source," and forwarded an email with the header information stripped out, showing only the body text. The email read, "Yes[.] I figured this. Assange is threatening Kerry, Ecuador and U.K. He will drop the goods on them if they move to extradite him. My guess is that he has a set of dead man files that include Hillary. It's what they used to call a 'Mexican stand off[.]' Only hope is that if Trump speaks out to save him[.] Otherwise he's dead anyway, once he's dropped what he has. If HRC wins, Assange can kiss his life away. Interesting gambit Assange has to play out. He's called Podesta's bluff and raised him the election."

75.     On or about October 18, 2016, CORSI messaged STONE at his iCloud account, "Pls call. Important."

76.     On or about October 19, 2016, STONE published an article on Breitbart.com in which he claimed he had, "no advance notice of Wikileaks' hacking of Podesta's e-mails." STONE stated that, "I predicted that Podesta's business dealings would be exposed. I didn't hear it from Wikileaks, although Julian Assange and I share a common friend. I reported the story on my website." STONE linked to the story he had asked CORSI to write for him on October 13, 2016 discussed above.

77.     On or about November 8, 2016, the United States presidential election took place.

78.     On or about November 9, 2016, CORSI messaged STONE at his iCloud account, "Congratulations, Roger. He could not have done it without you."

79.     On or about November 10, 2016, CORSI messaged STONE at his iCloud account, "Are you available to talk on phone?"  Several minutes later, CORSI messaged, "I'm in London. Have some interesting news for you."







## I. ██████████ Statements Regarding STONE's Use of Facebook

86.   On or about Friday, May 18, 2016, ████████ was voluntarily interviewed by investigators from the Special Counsel's Office. ████████ told investigators that he became STONE's assistant in Florida in 2015, and that during the summer of 2016, he acted as STONE's right-hand man.

87.   According to ████████ STONE utilized the services of several individuals to post social media content to Facebook and Twitter, and that he ████████ and STONE both instructed these individuals about what to post. ████████ stated that he purchased a couple hundred fake Facebook accounts as part of this work (including both new and existing accounts), and that bloggers working for STONE would try to build what looked like real Facebook accounts.[3] According to ████████ one of the individuals who did work for STONE on Facebook in 2016 was Everett WILKINSON, a social media marketer and IT expert.

88.   ████████ further stated that STONE wanted to push out WikiLeaks content through his Facebook and Twitter accounts, and that content related to the stolen Podesta emails was pushed out through STONE's Facebook and Twitter accounts.

---

[3] Facebook requires that all users of Facebook accounts use their actual name while registering and operating their accounts. The terms of service explicitly require that "Facebook users provide their real names and information . . . . You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission."

### J. The Target Accounts

89.     According to subscriber records obtained from Facebook, **Target Account 1**, with Facebook user ID ▮▮▮▮▮▮▮▮▮▮, is registered with the vanity name "rogerstone" and the email address ▮▮▮▮▮▮▮▮▮▮. **Target Account 1** is associated with ▮▮▮▮▮▮ ▮▮▮▮▮▮. Based on search warrant returns for STONE's ▮▮▮ account ▮▮▮▮▮▮▮▮▮, between on or about October 31, 2016 and November 3, 2016, ▮▮▮▮▮▮▮ received receipts from Facebook for the purchase of a number of advertisements associated with the **Target Account**, including advertisements with the following excerpted titles (as set forth in the receipts):

- "BREAKING: New #Wikileaks emails prove that Team..."
- "Roger Stone talked about WikiLeaks, Donald Trump,..."

90.     Additionally, on or about March 31, 2017, STONE received a Facebook receipt at his Hotmail account for advertisements associated with **Target Account 1**, with the following excerpted titles (as set forth in the receipt):

- "Stone Rebuts Charge of Russian Collusion"
- "I am not in touch with any Russians, don't have...,"
- "The charge that I am working for Russian...,"
- "In fullest statement yet on DNC hacking..."
- "ROGER STONE - NO consensus that Guccifer 2.0 is a..."

91.     **Target Account 2**, with Facebook user ID ▮▮▮▮▮▮▮, is registered with the vanity name "rogerstone," using the email account ▮▮▮▮▮▮▮. On or about August 13, 2017, STONE received a receipt from Facebook for several advertisements

associated with **Target Account 2,** including an advertisement with the excerpted title, "I am not

in touch with any Russians..."

92.     **Target Account 3** has the Facebook user ID ███████████ and was created

on or about October 27, 2015.  The account is registered in the name of ███████████ using

the email address ███████████████ and the verified telephone number ████████

████ According to a public records database, the telephone number ██████████ is linked to

██████████. Search warrant returns for STONE's █████████ account contain a notification from

Google indicating that ████████████████ is listed as the recovery email for

███████████████████ Search warrant returns for STONE's █████████ account also

contain a number of emails from Facebook to ███████████████ relating to **Target**

**Account 3**, which may have been auto-forwarded to STONE's Hotmail account.  These emails

include a notification of a password change to **Target Account 3** and at least one receipt for a

Facebook advertisement associated with **Target Account 3**, sent on or about June 30, 2016.  At

least one of these emails was then forwarded to ███████████ account (███████████).[4]

93.     As explained further below, in my training and experience, I know that, in

addition to posting content and purchasing advertisements, Facebook accounts can be used to

communicate privately and directly with other users through Facebook's messaging function.

This function is similar to the direct messaging function of Twitter, which STONE used to

communicate with WikiLeaks and ASSANGE in 2016 and 2017.

## BACKGROUND CONCERNING FACEBOOK

94.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

---

[4]     ███████ told investigators that he would sometimes send emails from STONE's account.

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

95.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

96.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

97.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

98.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

99.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

100.    Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages

through Facebook.   These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

101.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

102.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

103.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

104.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

105.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

106.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are

free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

107.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

108.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.   When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

109.     Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

110.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

111.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

112.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

113.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates,

and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

114.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## FILTER REVIEW PROCEDURES

115.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges. The procedures include use, if necessary, of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

116.     Based on the forgoing, I request that the Court issue the proposed search warrant.

117.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

118.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the full nature and extent of which is not known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Andrew Mitchell
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this _____ day of August, 2018.

The Honorable Beryl A. Howell
Chief United States District Judge

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Facebook accounts, which are stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a company headquartered at 1 Hacker Way, Menlo Park, California 94025:



## ATTACHMENT B

### I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All records relating to machine cookies;

(g)     All "check ins" and other location information, including records of the user's latitude and longitude;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     Group identification numbers; a list of users currently registered to the group; a list of users who like the page; group or page contact information, including all contact information for the creator and/or administrator of the group and a PDF of the current status of the group profile page;

(q)     All past and present Admins for the group;

(r)     The "Creator" of the group;

(s)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(t)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

(u)     All records related to advertisements and advertising conducted through the accounts, including advertisements purchased, advertising parameters (search terms, groups, geographic areas) selected and queried.

## II.     Information to be Seized by the Government

Any and all records that relate in any way to the accounts described in Attachment A which consists of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1030 (unauthorized access of a protected computer); 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (attempt and conspiracy to commit wire fraud), and 52 U.S.C. § 30121 (foreign contributions ban) for the period from June 2015 to the present, including:

a.     All records, information, documents or tangible materials that relate in any way to communications regarding hacking, release of hacked material, communications with persons or entities associated with WikiLeaks, including but not limited to Julian Assange, or communications regarding disinformation, denial, dissembling or other obfuscation about knowledge of, or access to, hacked material;

-4-

b.   All records, information, documents or tangible materials that relate in any way to communications or meetings involving Roger Stone, ███████████ Jerome Corsi, Julian Assange, and individual associated with WikiLeaks and/or with the Trump Campaign;

c.   Communications, records, documents, and other files related to any expenditure, independent expenditure, or disbursement for an electioneering communication;

d.   Records of any funds or benefits disbursed by or offered on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.   Communications, records, documents, and other files that reveal efforts by any person to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

f.   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g.   Evidence indicating the account user's state of mind as it relates to the crimes under investigation;

h.   The source of all funds used to purchase advertisements or make other expenditures or disbursements in these accounts;

i.   The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

j.  The identity of any non-U.S. person(s)—including records that help reveal the whereabouts of the person(s)—who made any expenditure, independent expenditure, or disbursement for an electioneering communication; and

k.  The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.