AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES<br>CONTROLLED BY TWITTER | )<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:18-sc-02596<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 8/8/2018<br>Description: Search & Seizure Warrant |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____August 21, 2018_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Beryl A. Howell, Chief U.S. District Judge_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____8/8/2018 at 3:00PM_____          _____Beryl A. Howell_____
                                                                                                          *Judge's signature*

City and state:      Washington, DC                              Hon. Beryl A. Howell, Chief U.S. District Judge
                                                                                      *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Twitter accounts, which are stored at premises owned, maintained, controlled, or operated by Twitter, Inc. ("Twitter"), a company headquartered in San Francisco, California:

## ATTACHMENT B

**I.      Information to be disclosed by Twitter**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, Inc. ("Twitter"), including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A:

A.     All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

B.     The content of all communications (public or private) sent to or from, stored in draft form in, or otherwise associated with the account, including the content of all messages, attachments, and header information;

C.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

D.     All other content associated with the account, including, but not limited to, posts, documents, spreadsheets, photos, and videos;

E.     All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (i.e., "mentions" or "replies");

F.     All photographs and images in the user gallery for the account;

G.     All location data associated with the account, including all information collected by the "Tweet With Location" service;

H.     All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

I.     All data and information that has been deleted by the user;

J.     A list of all of the people that the user follows on Twitter and all people who are following the user (i.e., the user's "following" list and "followers" list);

K.     A list of all users that the account has "unfollowed" or blocked;

L.     All "lists" created by the account;

M.    All information on the "Who to Follow" list for the account;

N.    All privacy and account settings;

O.    All records of Twitter searches performed by the account, including all past searches saved by the account;

P.    All current and historical subscriber and payment information, including full name, e-mail address (including any secondary or recovery email addresses), physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, telephone number, websites, screen names, user identification numbers, security questions and answers, registration IP address, payment history, and other personal identifiers;

Q.    All email addresses and telephone numbers ever registered (whether successfully or not) to the account, including dates of any changes and the IP addresses used for any changes;

R.    All past and current usernames, account passwords, and names associated with the account, including dates of any changes and the IP addresses used for any changes;

S.    All data and information associated with the profile page, including photographs;

T.    All advertising data relating to the account, including, but not limited to, information regarding unique advertising IDs associated with the user, any devices used to access the account, application IDs, UDIDs, payment information (including, but not limited to, full credit card numbers and expiration dates and PayPal accounts), ads clicked, and ads created;

U.    The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

V.    All transactional records associated with the account, including any IP logs or other records of session times and durations;

W.    Any information identifying the device or devices used to access the account, including a device serial number, a GUID or Global Unique Identifier, a phone number, serial numbers, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access the account;

X.    All activity logs for the account;

Y.    All location information for the account, including all  location data collected by any plugins or widgets;

Z.    The types of service utilized by the user;

AA.   All information about the account's use of Twitter's link service, including all website links embedded in, exporting data to, or importing data from, the account's website or blog;

BB.   All full website links that were shortened by Twitter's link service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

CC.   All information about connections between the account and third-party websites and applications, including any Twitter, Facebook or other social networking accounts to which posts from the account are sent;

DD.   All data and information that has been deleted by the user;

EE.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

FF.   All privacy settings and other account settings, including email addresses or other accounts that the account has blocked;

GG.   Information regarding linked accounts, including accounts linked by cookie, IP address (including registration IP address), advertising ID, User Client UUID, User Guest Cookie ID, Known Device Token, Normalized Email Address, Android ID, IMEI, GUID, device identifier, or any other account or device identifier;

HH.   Information regarding accounts linked to accounts to which the Target Accounts are linked;

II.   All records pertaining to communications between the Service Provider and any person regarding the user or the user's account with the Service Provider, including contacts with support services, records of actions taken, and investigative or user complaints concerning the subscriber.

## II.   Information to be Seized by the Government

Any and all records that relate in any way to the accounts described in Attachment A which consists of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1030 (unauthorized access of a protected computer); 18 U.S.C. §§ 1505 and 1512 (obstruction of justice), 18 U.S.C. § 1513 (witness tampering), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (attempt and conspiracy to commit wire fraud), and 52 U.S.C. § 30121 (foreign contributions ban) for the period from June 1, 2015 to the present, including:

a.     All records, information, documents or tangible materials that relate in any way to communications regarding hacking, release of hacked material, communications with persons or entities associated with WikiLeaks, including but not limited to Julian Assange, or communications regarding disinformation, denial, dissembling or other obfuscation about knowledge of, or access to, hacked material;

b.     All records, information, documents or tangible materials that relate in any way to communications or meetings involving Jerome Corsi, ███████████ Julian Assange, ████████████████████████ Randy Credico, or any individual associated with the Trump Campaign;

c.     Communications, records, documents, and other files related to any expenditure, independent expenditure, or disbursement for an electioneering communication;

d.     Records of any funds or benefits disbursed by or offered on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.     All images, messages, communications, calendar entries, search terms, "address book" entries and contacts, including any and all preparatory steps taken in furtherance of the above-listed offenses;

f.     Communications, records, documents, and other files that reveal efforts by any person to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

g. Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

h. Evidence indicating the account user's state of mind as it relates to the crimes under investigation;

i. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

j. Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

k. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

l. The identity of any non-U.S. person(s)—including records that help reveal the whereabouts of the person(s)—who made any expenditure, independent expenditure, or disbursement for an electioneering communication; and

m. The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

n. Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

o. All existing printouts from original storage which concern the categories identified in subsection II.a.

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

**FILED**

**AUG - 8 2018**

**Clerk, U.S. District and Bankruptcy Courts**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH
ONE ACCOUNT STORED AT PREMISES CONTROLLED
BY TWITTER

)
)
)
)
)
)

Case: 1:18−sc−02596
Assigned To : Howell, Beryl A.
Assign. Date : 8/8/2018
Description: Search & Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 52 U.S.C. § 30121 | Foreign Contribution Ban |
| 18 U.S.C. §§ 1001, 1030, 371 | False Statements, Unauthorized Access of Protected Computer, Conspiracy |
| See Affidavit for add'l | |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Reviewed by AUSA/SAUSA:

Kyle R. Freeny (ASC)

Andrew Mitchell,   Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___8/8/2018___

*Judge's signature*

City and state:   Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

**FILED**

AUG - 8 2018

Clerk, U.S. District and
Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER | Case: 1:18-sc-02596 Assigned To : Howell, Beryl A. Assign. Date : 8/8/2018 Description: Search & Seizure Warrant |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Mitchell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with the Twitter account ██████████ ("**Target Account**"), stored at premises owned, maintained, controlled or operated by Twitter, Inc. ("Twitter"), a company headquartered in San Francisco, California.  The information to be disclosed by Twitter and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since 2011.  As a Special Agent of the FBI, I have received training and experience in investigating criminal and national security matters.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other FBI personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **Target Account** contain evidence, fruits, or instrumentalities of violations of  18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18

U.S.C. § 1001 (false statements), 18 U.S.C. § 1030 (unauthorized access of a protected

computer), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (attempt and conspiracy to commit

wire fraud), 18 U.S.C. §§ 1505 and 1512 (obstruction of justice), 18 U.S.C. § 1513 (witness

tampering), and 52 U.S.C. § 30121(a)(1)(C) (foreign expenditure ban).  There also is probable

cause to search the information described in Attachment A for evidence, contraband, fruits,

and/or instrumentalities of the Subject Offenses, further described in Attachment B.

### JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  *Id.* §§ 2703(a), (b)(1)(A), &

(c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate

judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C.

§ 2711(3)(A)(i).  The offense conduct included activities in Washington, D.C., as detailed below.

### PROBABLE CAUSE

**A.  Background on Relevant Individuals**

      i.  *Roger STONE*

6.      Roger STONE is a self-employed political strategist/consultant and has been

actively involved in U.S. politics for decades.  STONE worked on the presidential campaign of

Donald J. Trump (the "Campaign") until August 2015.  Although Stone had no official

relationship with the Campaign thereafter, STONE maintained his support for Trump and

continued to make media appearances in support of the Campaign.  As described further below,

STONE also maintained contact with individuals employed by the Campaign, including then-

campaign chairman Paul MANAFORT and deputy chairman Rick GATES.

      ii.  *Jerome CORSI*

-2-

7.      Jerome CORSI is a political commentator who, according to publicly available information, currently serves as the "Washington Bureau Chief for Inforwars.com." According to publicly-available sources, from 2014 until January 2017, CORSI was a "senior staff reporter" for the website "World Net Daily" a/k/a "WND.com." CORSI has also written a number of books regarding Democratic presidential candidates. As described further below, CORSI was in contact with STONE during the summer and fall of 2016 regarding forthcoming disclosures of hacked information by WikiLeaks, and appears to have obtained information regarding upcoming disclosures which he relayed to STONE.



**B.      Russian Government-Backed Hacking Activity During the 2016 Presidential Election**

9.      On January 6, 2017, the USIC released a declassified version of an intelligence

assessment of Russian activities and intentions during the 2016 presidential election entitled,

"Assessing Russian Activities and Intentions in Recent US Elections." In the report, the USIC

assessed the following:

> [] Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the
> US presidential election. Russia's goals were to undermine public faith in the US
> democratic process, denigrate [former] Secretary [of State Hillary] Clinton, and harm her
> electability and potential presidency. We further assess Putin and the Russian
> Government developed a clear preference for President-elect Trump.

10.     In its assessment, the USIC also described, at a high level, some of the techniques

that the Russian government employed during its interference. The USIC summarized the efforts

as a "Russian messaging strategy that blends covert intelligence operations—such as cyber

activity—with overt efforts by Russian Government agencies, state-funded media, third-party

intermediaries, and paid social media users or 'trolls.'"

11.     With respect to "cyber activity," the USIC assessed that "Russia's intelligence

services conducted cyber operations against targets associated with the 2016 US presidential

election, including targets associated with both major US political parties." Further, "[i]n July

2015, Russian intelligence gained access to Democratic National Committee (DNC) networks

and maintained that access until at least June 2016." The USIC attributed these cyber activities

to the Russian GRU, also known as the Main Intelligence Directorate: "GRU operations resulted

in the compromise of the personal e-mail accounts of Democratic Party officials and political

figures. By May, the GRU had exfiltrated large volumes of data from the DNC."

12.     With respect to the release of stolen materials, the USIC assessed "with high

confidence that the GRU used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to

release US victim data obtained in cyber operations publicly and in exclusives to media outlets."

13.     Guccifer 2.0, who claimed to be an independent Romanian hacker, made multiple

contradictory statements and false claims about his identity throughout the election.

14.     The Special Counsel's Office has determined that individuals associated with the GRU continued to engage in hacking activity related to the 2016 presidential election through at least November 1, 2016.

15.     For example, in or around September 2016, these individuals successfully gained access to DNC computers housed on a third-party cloud-computing service.  In or around late September, these individuals stole data from these cloud-based computers by creating backups of the DNC's cloud-based systems using the cloud provider's own technology.  The individuals used three new accounts with the same cloud computing service to move the "snapshots" to those accounts.

16.     On or about September 4, 2016, individuals associated with the GRU stole the emails from a former White House advisor who was then advising the Clinton Campaign.  These emails were later post on DCLeaks.

17.     On or about November 1, 2016, individuals associated with the GRU spearphished over 100 accounts used by organizations and personnel involved in administering elections in numerous Florida counties.

18.     On July 13, 2018, a grand jury in the District of Columbia returned an indictment against twelve Russia military officers for criminal offenses related to efforts to influence the 2016 presidential election, including conspiracy to commit authorized access to protected computers. *See United States* v. *Viktor Borisovich Netyksho, et al.* (Case No. 1:18-cr-00125).

## C. STONE's Public Interactions with Guccifer 2.0 and WikiLeaks

19.     On June 14, 2016, CrowdStrike, the forensic firm that sought to remediate an unauthorized intrusion into the computer systems of the DNC, publicly attributed the hack to

Russian government actors and the media reported on the announcement. On June 15, 2016, the persona Guccifer 2.0 appeared and publicly claimed responsibility for the DNC hack. It stated on its WordPress blog that, with respect to the documents stolen from the DNC, "[t]he main part of the papers, thousands of files and mails, I gave to Wikileaks. They will publish them soon." In that post, Guccifer 2.0 also began releasing hacked DNC documents.

20.     On July 22, 2016, WikiLeaks published approximately 20,000 emails stolen from the DNC.

21.     On August 5, 2016, STONE published an article on Breitbart.com entitled, "Dear Hillary: DNC Hack Solved, So Now Stop Blaming Russia." The article stated: "It doesn't seem to be the Russians that hacked the DNC, but instead a hacker who goes by the name of Guccifer 2.0." The article contained embedded publicly available Tweets from Guccifer 2.0 in the article and stated: "Here's Guccifer 2.0's website. Have a look and you'll see he explains who he is and why he did the hack of the DNC." The article also stated: "Guccifer 2.0 made a fateful and wise decision. He went to WikiLeaks with the DNC files and the rest is history. Now the world would see for themselves how the Democrats had rigged the game."

22.     On August 8, 2016, STONE addressed the Southwest Broward Republican Organization. During his speech, he was asked about a statement by WikiLeaks founder Julian ASSANGE to Russia Today (RT) several days earlier about an upcoming "October Surprise" aimed at the Hillary Clinton presidential campaign. Specifically, STONE was asked: "With regard to the October surprise, what would be your forecast on that given what Julian Assange has intimated he's going to do?" STONE responded: "Well, it could be any number of things. I actually have communicated with Assange. I believe the next tranche of his documents pertain to the Clinton Foundation but there's no telling what the October surprise may be." A few days

later, STONE clarified that while he was not personally in touch with ASSANGE, he had a close friend who served as an intermediary.

23.    On August 12, 2016, Guccifer 2.0 publicly tweeted: "@RogerJStoneJr thanks that u believe in the real #Guccifer2." That same day, Guccifer 2.0 released the personal cellphone numbers and email addresses from the files of the DCCC.

24.    On August 13, 2016, STONE posted a tweet using @RogerJStoneJr calling Guccifer 2.0 a "HERO" after Guccifer 2.0 had been banned from Twitter. The next day, Guccifer 2.0's Twitter account was reinstated.

25.    On August 17, 2016, Guccifer 2.0 publicly tweeted, "@RogerJStoneJr paying you back." Guccifer also sent a private message to @RogerJStoneJr stating "i'm pleased to say u r great man. please tell me if I can help u anyhow. it would be a great pleasure to me."

26.    On August 18, 2016, Paul MANAFORT, STONE's longtime friend and associate, resigned as Chairman of the Trump Campaign. Contemporary press reports at the time indicated that MANAFORT had worked with a Washington D.C.-based lobbying firms to influence U.S. policy toward Ukraine.

27.    On August 21, 2016, using @RogerJStoneJR, STONE tweeted: "Trust me, it will soon the [sic] Podesta's time in the barrel. #CrookedHillary." In a C-SPAN interview that same day, STONE reiterated that because of the work of a "'mutual acquaintance' of both his and [ASSANGE], the public [could] expect to see much more from the exiled whistleblower in the form of strategically-dumped Clinton email batches." He added: "Well, first of all, I think Julian Assange is a hero... I think he's taking on the deep state, both Republican and Democrat. I believe that he is in possession of all of those emails that Huma Abedin and Cheryl Mills, the Clinton aides, believe they deleted. That and a lot more. These are like the Watergate tapes."

28.    On September 16, 2016, STONE said in a radio interview with Boston Herald Radio that he expected WikiLeaks to "drop a payload of new documents on Hillary on a weekly basis fairly soon. And that of course will answer the question as to what exactly what was erased on that email server."

29.    On Saturday, October 1, 2016, using @RogerJStoneJr, STONE tweeted, "Wednesday @ HillaryClinton is done. #WikiLeaks."

30.    On Sunday, October 2, 2016, MSNBC Morning Joe producer Jesse Rodriquez tweeted regarding an announcement ASSANGE had scheduled for the next day from the balcony of the Ecuadoran Embassy in London.  On the day of the ASSANGE announcement – which was part of WikiLeaks' 10-year anniversary celebration – STONE told Infowars that his intermediary described this release as the "mother load." On October 5, 2016, STONE used @RogerJStoneJr to tweet: "Payload coming. #Lockthemup."

31.    On Friday, October 7, 2016, at approximately 4:03 PM, the Washington Post published an article containing a recorded conversation from a 2005 Access Hollywood shoot in which Mr. Trump had made a series of lewd remarks.

32.    Approximately a half hour later, at 4:32 PM, WikiLeaks sent a Tweet reading "RELEASE: The Podesta Emails #HillaryClinton #Podesta #imWithHer" and containing a link to approximately 2,050 emails that had been hacked from John Podesta's personal email account.

33.    WikiLeaks continued to release John Podesta's hacked emails through Election Day, November 8, 2016. On October 12, 2016, Podesta – referring back to STONE's August 21, 2016 C-SPAN and Twitter references – argued publicly that "[it is] a reasonable assumption to - or at least a reasonable conclusion - that [STONE] had advanced warning [of the release of his emails] and the Trump campaign had advanced warning about what Assange was going to do. I

think there's at least a reasonable belief that [Assange] may have passed this information on to

[STONE]." Commenting to the NBC News, STONE indicated that he had never met or spoken

with Assange, saying that "we have a mutual friend who's traveled to London several times, and

everything I know is through that channel of communications. I'm not implying I have any

influence with him or that I have advanced knowledge of the specifics of what he is going to do.

I do believe he has all of the e-mails that Huma Abedin and Cheryl Mills, the Clinton aides,

thought were deleted. I hear that through my emissary."

34.     On March 27, 2017, CNN reported that a representative of WikiLeaks, writing

from an email address associated with WikiLeaks, denied that there was any backchannel

communication during the Campaign between STONE and WikiLeaks. The same article quoted

STONE as stating: "Since I never communicated with WikiLeaks, I guess I must be innocent of

charges I knew about the hacking of Podesta's email (speculation and conjecture) and the timing

or scope of their subsequent disclosures. So I am clairvoyant or just a good guesser because the

limited things I did predict (Oct disclosures) all came true."

### D.  STONE's Private Twitter Direct Messages with WikiLeaks and ASSANGE

35.     On October 13, 2016, while WikiLeaks was in the midst of releasing the hacked

Podesta emails, the Twitter account @RogerJStoneJr sent a private direct message to the Twitter

account @wikileaks.[1] The latter account is the official Twitter account of WikiLeaks and has

been described as such by numerous news reports. The message read: "Since I was all over

national TV, cable and print defending WikiLeaks and assange against the claim that you are

Russian agents and debunking the false charges of sexual assault as trumped up bs you may want

---

[1] On or about August 7, 2017, Chief Judge Beryl A. Howell issued a search warrant for the
Twitter account @RogerJStoneJr.

to rexamine the strategy of attacking me- cordially R."

36.     Less than an hour later, @wikileaks responded by direct message: "We appreciate that. However, the false claims of association are being used by the democrats to undermine the impact of our publications. Don't go there if you don't want us to correct you."

37.     On or about October 15, 2016, @RogerJStoneJr sent a direct message to @wikileaks: "Ha! The more you \"correct\" me the more people think you're lying. Your operation leaks like a sieve. You need to figure out who your friends are."

38.     On or about November 9, 2016, one day after the presidential election, @wikileaks sent a direct message to @RogerJStoneJr containing a single word: "Happy?" @wikileaks immediately followed up with another message less than a minute later: "We are now more free to communicate."

39.     In addition, @RogerJStoneJr also exchanged direct messages with ASSANGE, the founder of WikiLeaks. For example, on June 4, 2017, @RogerJStoneJr directly messaged @JulianAssange, an address associated with ASSANGE in numerous public reports, stating: "Still nonsense. As a journalist it doesn't matter where you get information only that it is accurate and authentic. The New York Times printed the Pentagon Papers which were indisputably stolen from the government and the courts ruled it was legal to do so and refused to issue an order restraining the paper from publishing additional articles. If the US government moves on you I will bring down the entire house of cards. With the trumped-up sexual assault charges dropped I don't know of any crime you need to be pardoned for - best regards. R."  That same day, @JulianAssange responded: "Between CIA and DoJ they're doing quite a lot. On the DoJ side that's coming most strongly from those obsessed with taking down Trump trying to squeeze us into a deal."

40.     On Saturday, June 10, 2017, @RogerJStoneJr sent a direct message to @JulianAssange, reading: "I am doing everything possible to address the issues at the highest level of Government. Fed treatment of you and WikiLeaks is an outrage. Must be circumspect in this forum as experience demonstrates it is monitored. Best regards R."

**E.  CORSI's Communications with STONE** ███████ **and Others Regarding Forthcoming Leaks**

41.     On September 11, 2017, Chief Judge Beryl A. Howell of the District of Columbia issued a search warrant for STONE's ██████ address ████████████. On October 17, 2017, Chief Judge Howell issued a search warrant for one of STONE's ██████ addresses, ████████████████ On or about December 19, 2017, Chief Judge Howell issued a search warrant fo ████████ email account. On or about March 14, 2018, Chief Judge Howell issued a search warrant for STONE's iCloud account. Information recovered pursuant to those search warrants indicated the following:

42.     On or about May 15, 2016, ████████ emailed CORSI: "Here is my flight schedule. Need to get something confirmed now . . . ." CORSI responded, "I copied Roger Stone so he knows your availability to meet Manafort and DT this coming week." CORSI appears to have forwarded the message to STONE at ████████████, who replied to CORSI that, "May meet Manafort -guarantee nothing."

43.     On or about May 18, 2016, CORSI emailed STONE at ████████████████ with the title, "Roger -- why don't you look this over before I send it ██████████ I believe that ████████████████████████████████████ CORSI wrote, ████████████████ and I did manage to see Mr. Trump for a few minutes today as we were waiting in Trump Tower to say hello to Mike Cohen. Mr. Trump recognized us immediately and was very cordial. He would look for this memo from you this afternoon."

44.     On July 25, 2016, STONE, using ███████████████████, sent an email to CORSI with the subject line, "Get to Assange."  The body of the message read: "Get to Assange [a]t Ecuadorian Embassy in London and get the pending WikiLeaks emails…they deal with Foundation, allegedly."

45.     On or about July 31, 2016, STONE, using ███████████████████, emailed CORSI with the subject line, "Call me MON."  The body of the email read ███████ should see Assange[.] ███████ should find Bernie [S]anders brother who called Bill a Rapist – turn him for Trump[.] ███████ should find ██████████ or more proof of Bill getting kicked out."

46.     On or about August 2, 2016 (approximately 19 days before STONE publicly tweeted about "Podesta's time in the barrel"), CORSI emailed STONE at ██████████████████████ "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging."  The email continued, "Signs are Fox will have me on mid-Aug. more post Ailes shakeup underway. Expect Shine to surface victor, for now. Post-DNC bump for HRC an artifact of rigged polling. Won't last. I expect presidential campaign to get serious starting Sept. Still in pre-season games. Time to let more than Podesta to be exposed as in bed w enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke -- neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle." Investigators believe that CORSI's reference to a "friend in embassy [who] plans 2 more dumps" refers to ASSANGE, who resided in Ecuador's London Embassy in 2016.

47.     On or about August 5, 2016, ████████████████ an associate of STONE's, emailed STONE at ████████████████████ The email contained a link to a poll indicating that Clinton led Trump by 15 points.  STONE responded "enjoy it while u can[.] I dined with my new pal

Julian Assange last night." ███████ subsequently stated to investigators that, around the

same time, STONE told him he had gone to London to meet ASSANGE ███████ also stated

that in 2018 ███████ told STONE he would be interviewed by the FBI and would have to

divulge the conversation about meeting ASSANGE. STONE told ███████ he was joking and

had not actually met ASSANGE.[2]

48.     On or about August 15, 2016, CORSI emailed STONE at

███████████████ "Give me a call today if you can. Despite MSM drumroll that HRC is

already elected, it's not over yet. More to come than anyone realizes. Won't really get started

until after Labor Day. I'm in NYC this week. Jerry."

49.     On or about August 31, 2016, CORSI emailed STONE at

███████████████: "Did you get the PODESTA writeup." STONE replied "[y]es."

50.     On or about August 31, 2016, CORSI messaged STONE, "Podesta paid $180k to

invest in Uranium One – was hired by Rosatom in Giustra scandal. Podesta now under FBI

investigation – tied to Ukraine Yanukovych – Panama papers reveals Podesta hired by

S[b]erbank, Russia's largest financial institution – Podesta $$$ ties to Russia undermine Clinton

false narrative attempting to tie Trump to Putin."

51.     On or about September 6, 2016, CORSI emailed STONE at

███████████████ "Roger[,] Is NY Post going to use the Pedesta [sic] stuff?"



52.     On or about September 24, 2016 ███████ emailed CORSI, "I will have much more on Turkey. Need a back channel highly sensitive stuff." CORSI responded, "We have secure back channel through Roger. I saw him again in NYC last Friday and spoke to him about it again today. ███████ wrote back, "Awaiting secret file. Explosive... Hope you are well. Can't wait for the debate. Channeling Reagan, I hope!" CORSI responded, "Keep me posted about file[.]" In a subsequent meeting with investigators ███████ indicated this conversation concerned possible derogatory information he was trying to obtain from Turkey.

53.     On or about October 3, 2016, an associate of STONE emailed STONE at ███████████ and asked: "Assange – what's he got? Hope it's good." STONE wrote back, "It is. I'd tell Bannon but he doesn't call me back. My book on the TRUMP campaign will be out in Jan. Many scores will be settled." The associate forwarded the email to Steve BANNON, who was CEO of the Campaign at the time, and wrote: "You should call Roger. See below. You didn't get from me." BANNON wrote back, "I've got important stuff to worry about." The associate responded, "Well clearly he knows what Assange has. I'd say that's important."

54.     On or about October 4, 2016, ASSANGE gave a press conference at the Ecuadorian Embassy. There had been speculation in the press leading up to that event that ASSANGE would release information damaging to then-candidate Clinton, but WikiLeaks did not make any new releases. Instead, ASSANGE promised more documents, including information "affecting three powerful organizations in three different states, as well as, of course, information previously referred to about the U.S. election process." ASSANGE also stated that WikiLeaks would publish documents on various subjects every week for the next ten weeks, and vowed that the U.S. election-related documents would all come out before Election Day.

55.    On or about October 4, 2016, CORSI messaged STONE at his iCloud account: "Assange made a fool of himself. Has nothing or he would have released it. Total BS hype."

56.    That same day, BANNON emailed STONE a ▮▮▮▮▮▮▮, "What was that this morning???" STONE replied, "Fear. Serious security concern. He thinks they are going to kill him and the London police are standing done [sic]." BANNON wrote back, "He didn't cut deal w/ clintons???" STONE replied, "Don't think so BUT his lawye▮▮ is a big democrat."

57.    When BANNON spoke with investigators during a voluntary interview on February 14, 2018, he initially denied knowing whether the October 4, 2016 email to STONE was about WikiLeaks. Upon further questioning, BANNON acknowledged that he was asking STONE about WikiLeaks, because he had heard that STONE had a channel to ASSANGE, and BANNON had been hoping for releases of damaging information that morning.

## F. STONE and CORSI Communications on October 7, 2016, when the Podesta Emails Are Released.

58.    According to a publicly available news article,[3] at approximately 11AM on Friday, October 7, 2016, Washington Post reporter David Fahrenthold received a phone call from a source regarding a previously unaired video of candidate Trump. According to the same article, "Fahrenthold didn't hesitate. Within a few moments of watching an outtake of footage from a 2005 segment on 'Access Hollywood,' the Washington Post reporter was on the phone, calling Trump's campaign, 'Access Hollywood,' and NBC for reaction."

---

[3] https://www.washingtonpost.com/lifestyle/style/the-caller-had-a-lewd-tape-of-donald-trump-then-the-race-was-on/2016/10/07/31d74714-8ce5-11e6-875e-2c1bfe943b66_story.html

59.     According to phone record ████████████████████, at approximately 11:27 AM, CORSI placed a call to STONE, which STONE did not answer.

60.     At approximately 11:53AM, STONE received a phone call from the Washington Post. The call lasted approximately twenty minutes.

61.     At approximately 1:42PM, STONE called CORSI and the two spoke for approximately seventeen minutes.

62.     At approximately 2:18PM, CORSI called STONE and the two spoke for approximately twenty minutes.

63.     At approximately 4:00PM, the Washington Post published a story regarding the Access Hollywood tape.

64.     At approximately 4:30PM, WikiLeaks tweeted out its first release of emails hacked from John Podesta that focused primarily on materials related to the Clinton Foundation. On or about August 2, 2016, CORSI emailed STONE using ████████████████, "I expect that much of next dump focus, setting stage for Foundation debacle."

65.     At approximately 6:27PM, ████████████, an author who has written about the Clinton Foundation, and who, according to emails and phone records, regularly communicates with STONE, sent STONE an email titled, "WikiLeaks – The Podesta Emails," with a link to the newly-released Podesta emails. Approximately ten minutes later, STONE, using ████████████████ forwarded ██████ message to CORSI without comment. STONE does not appear to have forwarded the email to any other individual.

**G. STONE Asks CORSI for "SOMETHING" to Post About Podesta After STONE Is Accused of Advance Knowledge of the Leak**

66.     On or about October 8, 2016, STONE messaged CORSI, "Lunch postponed – have to go see T." CORSI responded to STONE, "Ok. I understand." Approximately twenty minutes later, CORSI texted, "Clintons know they will lose a week of Paula Jones media with T attacking Foundation, using Wikileaks Goldman Sachs speech comments, attacking bad job numbers."

67.     On or about Wednesday, October 12, 2016, at approximately 8:17AM, STONE, using ██████████████, emailed Corsi asking him to "send me your best podesta links." STONE emailed CORSI at approximately 8:44AM EDT, "need your BEST podesta pieces." CORSI wrote back at approximately 8:54AM EDT, "Ok. Monday.  The remaining stuff on Podesta is complicated.  Two articles in length.  I can give you in raw form the stuff I got in Russian translated but to write it up so it's easy to understand will take weekend. Your choice?"

68.     On or about that same day, October 12, 2016, Podesta accused STONE of having advance knowledge of the publication of his emails.  At approximately 3:25PM EDT, CORSI emailed STONE at both ████████████████████████████, with the subject line "Podesta talking points." Attached to the email was a file labeled, "ROGER STONE podesta talking points Oct 12 2016.docx." The "talking points" included the statement that "Podesta is at the heart of a Russian-government money laundering operation that benefits financially Podesta personally and the Clintons through the Clinton Foundation."

69.     CORSI followed up several minutes later with another email titled, "Podesta talking points," with the text "sent a second time just to be sure you got it." STONE emailed CORSI back via the Hotmail Account, "Got them and used them."

70.     On or about Thursday, October 13, 2016, CORSI emailed STONE at

████████████████████ : "PODESTA -- Joule & ties to RUSSIA MONEY LAUNDERING to

CLINTON FOUNDATION." STONE responded, "Nice but I was hoping for a piece I could

post under my by-line since I am the one under attack by Podesta and now Mook." CORSI

wrote back to STONE, "I'll give you one more — NOBODY YET HAS THIS[:] It looks to me

like ████████ skimmed maybe billions off Skolkovo — Skolkovo kept their money with

Metcombank[.] The Russians launched a criminal investigation[.] [web link] Once ████████

had the channel open from Metcombank to Deutsche Bank America to Ban[k] of America's

Clinton Fund account, there's no telling how much money he laundered, or where it ended up.

Nothing in Clinton Foundation audited financials or IRS Form 990s about $$$ received via

Russia & Metcombank[.] I'm working on that angle now." STONE replied, "Ok Give me

SOMETHING to post on Podesta since I have now promised it to a dozen MSM reporters[.]"

71.     On or about Thursday, October 13, 2016 at approximately 6:30PM EDT, CORSI

sent STONE an email at ████████████████ with the subject, "ROGER STONE article

RUSSIAN MAFIA STYLE MONEY-LAUNDERING, the CLINTON FOUNDATION, and

JOHN PODESTA." The text stated: "Roger[,] You are free to publish this under your own

name." That same day, STONE posted a blog post with the title, "Russian Mafia money

laundering, the Clinton Foundation and John Podesta." In that post, STONE wrote, "although I

have had some back-channel communications with Wikileaks I had no advance notice about the

hacking of Mr. Podesta nor I have I ever received documents or data from Wikileaks." The post

then asked, "Just how much money did ████████████ a controversial Russian billionaire

investor with ties to the Vladimir Putin and the Russian government, launder through

Metcombank, a Russian regional bank owned 99.978 percent by ████████ with the money

transferred via Deutsche Bank and Trust Company Americas in New York City, with the money ending up in a private bank account in the Bank of America that is operated by the Clinton Foundation?"

72.     On or about October 14, 2016, CORSI sent a message to STONE at his iCloud account, "I'm in NYC. Thinking about writing piece attacking Leer and other women. It's basically a rewrite of what's out there. Going through new Wikileaks drop on Podesta."

73.     On or about October 17, 2016, CORSI messaged STONE at his iCloud account, "On Assange, can you call me now – before 2pm[.]"  STONE responded, "Missed u – just landed JFK – on Infowars now." CORSI wrote back, "Call afterwards. Have some important intel to share."

74.     On or about October 17, 2016, CORSI emailed STONE at ████████████████████████████ with the subject, "Fwd: ASSANGE...URGENT..." CORSI wrote, "From a very trusted source," and forwarded an email with the header information stripped out, showing only the body text. The email read, "Yes[.] I figured this. Assange is threatening Kerry, Ecuador and U.K. He will drop the goods on them if they move to extradite him. My guess is that he has a set of dead man files that include Hillary. It's what they used to call a 'Mexican stand off[.]' Only hope is that if Trump speaks out to save him[.] Otherwise he's dead anyway, once he's dropped what he has. If HRC wins, Assange can kiss his life away. Interesting gambit Assange has to play out. He's called Podesta's bluff and raised him the election."

75.     On or about October 18, 2016, CORSI messaged STONE at his iCloud account, "Pls call. Important."

-19-

76.    On or about October 19, 2016, STONE published an article on Breitbart.com in

which he claimed he had, "no advance notice of Wikileaks' hacking of Podesta's e-mails."

STONE stated that, "I predicted that Podesta's business dealings would be exposed. I didn't hear

it from Wikileaks, although Julian Assange and I share a common friend. I reported the story on

my website." STONE linked to the story he had asked CORSI to write for him on October 13,

2016 discussed above.

77.    On or about November 8, 2016, the United States presidential election took place.

78.    On or about November 9, 2016, CORSI messaged STONE at his iCloud account,

"Congratulations, Roger. He could not have done it without you."

79.    On or about November 10, 2016, CORSI messaged STONE at his iCloud

account, "Are you available to talk on phone?"  Several minutes later, CORSI messaged, "I'm in

London. Have some interesting news for you."







## I.  STONE's Congressional Testimony and Public Statements About His Relationship with Wikileaks

87.     On September 26, 2017, STONE testified before the House Permanent Select

Committee on Intelligence (HPSCI).  Although the hearing was closed, STONE released to the

public what he said were his opening remarks to the committee.  In them, STONE stated:

> Members of this Committee have made three basic assertions against me which must be
> rebutted here today.  The charge that I knew in advance about, and predicted, the hacking
> of Clinton campaign chairman John Podesta's email, that I had advanced knowledge of
> the source or actual content of the WikiLeaks disclosures regarding Hillary Clinton or
> that, my now public exchange with a persona that our intelligence agencies claim, but
> cannot prove, is a Russian asset, is anything but innocuous and are entirely false.  Again,
> such assertions are conjecture, supposition, projection, and allegations but none of them
> are facts. . . .

> My Tweet of August 21, 2016, in which I said, "Trust me, it will soon be the Podesta's
> time in the barrel. #CrookedHillary" must be examined in context.  I posted this at a time
> that my boyhood friend and colleague, Paul Manafort, had just resigned from the Trump
> campaign over allegations regarding his business activities in Ukraine.  I thought it
> manifestly unfair that John Podesta not be held to the same standard.  Note, that my
> Tweet of August 21, 2016, makes no mention, whatsoever, of Mr. Podesta's email, but

does accurately predict that the Podesta brothers' business activities in Russia with the oligarchs around Putin, their uranium deal, their bank deal, and their Gazprom deal, would come under public scrutiny. . . .

[L]et me address the charge that I had advance knowledge of the timing, content and source of the WikiLeaks disclosures from the DNC.  On June 12, 2016, WikiLeaks' publisher Julian Assange[] announced that he was in possession of Clinton DNC emails.  I learned this by reading it on Twitter.  I asked a journalist who I knew had interviewed Assange to independently confirm this report, and he subsequently did.  This journalist assured me that WikiLeaks would release this information in October and continued to assure me of this throughout the balance of August and all of September.  This information proved to be correct.  I have referred publicly to this journalist as an, "intermediary", "go-between" and "mutual friend." All of these monikers are equally true.

88.      In a document dated March 26, 2018 titled "Minority Views," Democratic

members of HPSCI published excerpts from Stone's September 2017 testimony before HPSCI.

Those excerpts include the following:

Q: Have any of your employees, associates, or individuals acting on your behest or encouragement been in any type of contact with Julian Assange?
MR. STONE: No.
...
Q: So throughout the many months in which you represented you were either in communication with Assange or communication through an intermediary with Assange, you were only referring to a single fact that you had confirmed with the intermediary –
MR. STONE: That –
Q: -- was the length and the breadth of what you were referring to?
MR. STONE: That is correct, even though it was repeated to me on numerous separate occasions.

89.      In the month that followed his testimony before HPSCI, on or about October 24,

2017, STONE published an article on his website, stonecoldtruth.com, titled "Is it the Podesta's

Time in the Barrel Yet?"  In that article, STONE stated: "[I]t was this inevitable scrutiny of the

Podestas' underhanded business dealings that my 'time in the barrel' referred to and not, as some

have quite falsely claimed, to the hacking and publication almost two months later of John

Podesta's emails. . . .  [M]y tweet referred to Podesta's business dealings with Russia, and the

expectation that it would become a news story."

### J.  STONE's Messaging to Randy CREDICO about STONE's "Back channel"

90.     On or about November 19, 2017, Randy CREDICO (who, as described further below, STONE publicly identified as his "intermediary" to ASSANGE), messaged STONE, "My lawyer wants to see me today." STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan'........Richard Nixon[.]" CREDICO responded, "Ha ha."

91.     On or about November 21, 2017, CREDICO messaged STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena[.]" STONE wrote back, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear." They continued to message, and CREDICO wrote, "My lawyer wants me to cut a deal." STONE wrote back, "To do what ? Nothing happening in DC the day before Thanksgiving – why are u busting my chops?"

92.     On or about November 24, 2017, STONE, texted CREDICO, "Assange is a journalist and a damn good one- meeting with him is perfectly legal and all you ever told me was he had the goods [o]n Hillary and would publish them – which he himself said in public b4 u told me . It's a fucking witchunt [sic]." CREDICO replied, "I told you to watch his tweets. That's what I was basing it on. I told you to watch his Tweets in October not before that I knew nothing about the DNC stuff[.] I just followed his tweets[.]" STONE responded, "U never said anything about the DNC but it was August." CREDICO wrote back, "It was not August because I didn't interview him or meet him until August 26th[.] That was my first communication with his secretary in London, August 26th." STONE wrote back, "Not the way I remember it – oh well I guess Schiff will try to get one of us indicted for perjury[.]"

93.     STONE and CREDICO continued to exchange messages and on November 24, 2017, CREDICO wrote to STONE, "Forensic evidence proves that there is no back Channel. So now you can relax."

94.     On or about November 28, 2017, CREDICO tweeted a copy of a subpoena he received from HPSCI that was dated November 27, 2017.  Toll records show that on November 27 and 28, 2017, CREDICO and STONE communicated via text message more than a dozen times.

95.     On November 29, 2017, STONE publicly stated that CREDICO was his "intermediary."  In a public Facebook post, STONE further stated that "Credico merely [] confirmed for Mr. Stone the accuracy of Julian Assange's interview of June 12, 2016 with the British ITV network, where Assange said he had 'e-mails related to Hillary Clinton which are pending publication,' . . . Credico never said he knew or had any information as to source or content of the material."

96.     On or about December 1, 2017, CREDICO messaged STONE, "I don't know why you had to lie and say you had a back Channel now I had to give all of my forensic evidence to the FBI today what a headache[.][4] You could have just told him the truth that you didn't have a back Channel they now know that I was not in London until September of this year[.] You had no back-channel and you could have just told the truth . . . You want me to cover you for perjury now[.]" STONE responded, "What the fuck is your problem? Neither of us has done anything wrong or illegal.  You got the best press of your life and you can get away with asserting for 5th Amendment rights if u don't want talk about AND if you turned over anything to the FBI you're a fool." CREDICO responded, "You open yourself up to six counts of perjury[.] But I'm sure

---

[4] Contrary to his statement, CREDICO has not provided any forensic evidence to the FBI.

that wasn't sworn testimony so you're probably clear[.] Council for the committee knows you never had a back Channel and if you had just told the truth wouldn't have put me in this bad spot . . . you should go back . . . and amend your testimony and tell them the truth." CREDICO repeated: "you need to amend your testimony before I testify on the 15th." STONE replied, "If you testify you're a fool. Because of tromp [sic] I could never get away with a certain [sic] my Fifth Amendment rights but you can. I guarantee you you [sic] are the one who gets indicted for perjury if you're stupid enough to testify[.]"

97.     STONE and CREDICO continued to message each other on or about December 1, 2017. In response to STONE's message about being "stupid enough to testify," CREDICO told STONE: "Whatever you want to say I have solid forensic evidence." STONE responded: "Get yourself a real lawyer instead of some liberal wimp who doesn't know how to tell his guys to fuck off good night." CREDICO then wrote: "Just tell them the truth and swallow your ego you never had a back Channel particularly on June 12th[.]" STONE responded: "You got nothing."

98.     On or about December 13, 2017, according to public reporting, CREDICO indicated that he would not testify before HPSCI and would invoke his Fifth Amendment rights.

99.     STONE and CREDICO continued to exchange text messages, and on or about January 6, 2018, CREDICO indicated to STONE that he was having dinner with a reporter. STONE responded, "Hope u don't fuck Up my efforts to get Assange a pardon[.]" CREDICO messaged STONE, "I have the email from his chief of staff August 25th 2016 responding to an email I sent to WikiLeaks website email address asking you would.do my show[.] That was my initial contact."

100.    On or about January 8, 2018, CREDICO messaged STONE, stating: "Embassy logs . . . + 17 other pieces of information prove that I did not have any conversations with Assange until September of last year."

101.    CREDICO and STONE continued to message each other, and on or about January 25, 2018, CREDICO wrote to STONE: "You lied to the house Intel committee . . . But you'll get off because you're friends with Trump so don't worry.  I have all the forensic evidence[.]  I was not a ba[ck] Channel and I have all those emails from September of 2016 to prove it[.]"

102.    On or about April 13, 2018, news reports stated that CREDICO had shown reporters copies of email messages he had received from STONE in the prior few days that stated, "You are a rat.  You are a stoolie.  You backstab your friends — run your mouth my lawyers are dying Rip you to shreds."  Another message stated, "I'm going to take that dog away from you," referring to CREDICO's therapy dog.  CREDICO stated that it was "certainly scary . . . When you start bringing up my dog, you're crossing the line[.]"[5]

103.    On or about May 25, 2018, CREDICO provided additional messages he stated were from STONE to another news agency.[6]  In these messages, STONE, on April 9, 2018, stated: "I am so ready.  Let's get it on. Prepare to die[.]"  In the article, CREDICO stated that he considered this email from STONE a threat.  STONE stated in the article that CREDICO "told me he had terminal prostate cancer . . . It was sent in response to that.  We talked about it too. He was depressed about it.  Or was he lying."  The article noted that CREDICO stated he did not have prostate cancer and did not have any such discussion with STONE.

---

[5] https://www.yahoo.com/news/comedian-randy-credico-says-trump-adviser-roger-stone-threatened-dog-135911370.html

[6] https://www.motherjones.com/politics/2018/05/roger-stone-to-associate-prepare-to-die/

**K.** ████████ **s Statements Regarding STONE's Use of Social Media**

104.     On or about Friday, May 18, 2018 ████████████ S was voluntarily interviewed by investigators from the Special Counsel's Office ███████████ told investigators that he became STONE's assistant in Florida in 2015, and that during the summer of 2016, he acted as STONE's right-hand man.

105.     According to ████████, STONE utilized the services of several individuals to post social media content to Facebook and Twitter, and that he ████████) and STONE both instructed these individuals about what to post. ████████ stated that he purchased a couple hundred fake Facebook accounts as part of this work (including both new and existing accounts), and that bloggers working for STONE would try to build what looked like real Facebook accounts.

106.     ████████ further stated that STONE wanted to push out WikiLeaks content through his Facebook and Twitter accounts, and that content related to the stolen Podesta emails was pushed out through STONE's Facebook and Twitter accounts.

**L.  The Target Account**

107.     The **Target Account** is a Twitter account with username ████████████ Search warrant returns for STONE's Hotmail account contain emails from Twitter about **Target** ████████████████ which appear to have originally been sent to ████████████████. Although it is not clear from the face of the emails how they ended up in STONE's Hotmail account,[7] they may have been auto-forwarded or otherwise imported from ████████████████ to the Hotmail account.  Subscriber records

---

[7] Investigators have been unable to access the full headers for these emails.

obtained from Google show th█████████████████████n was registered using STONE's

Hotmail address █████████████████n, as the recovery account.[8]

108.   Tweets associated with the **Target Account**, which are publicly available, include

the retweeting of content related to WikiLeaks, STONE's testimony before the House

Intelligence Committee, and the hacking of the DNC. The **Target Account** was also used to

retweet content with the hashtag #FreeAssange! The **Target Account** is listed as having been

created in March 2016 and bears the picture of a person purporting to b█████████████

109.   In my training and experience, I know that, in addition to posting content and

purchasing advertisements, Twitter accounts can be used to communicate privately and directly

with other users through Twitter's direct messaging function. As noted above, STONE used at

least one other Twitter account, @RogerJStoneJr, to communicate with WikiLeaks and

ASSANGE in 2016 and 2017.

## BACKGROUND CONCERNING TWITTER

110.   Twitter owns and operates a free-access social-networking website of the same

name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own

profile pages, which can include a short biography, a photo of themselves, and location

information. Twitter also permits users create and read 140-character messages called "Tweets,"

and to restrict their "Tweets" to individuals whom they approve. These features are described in

more detail below.

111.   Upon creating a Twitter account, a Twitter user must create a unique Twitter

username and an account password, and the user may also select a different name of 20

---

[8] █████████████████████ was also used to register a Facebook account. This Court
authorized a search of that Facebook account on or about August 2, 2018 (1:18-sw-2570).

characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

112.    Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

113.    A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

114.    Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

115.    As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted"

the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

116.    Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

117.    Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

118.    When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

119.    A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

120.     In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

121.     Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

122.     Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

123.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

124.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

125.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user

for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

126.    As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time.  Further, Twitter account activity can show how and when the account was accessed or used.  For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation.  Additionally, Twitter builds geo-location into some of its services.  If enabled by the user, physical location is automatically added to "tweeted" communications.  This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner.  Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates

to the offense under investigation.  For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

127.    Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## FILTER REVIEW PROCEDURES

128.    Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges. The procedures include use, if necessary, of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

129.    Based on the forgoing, I request that the Court issue the proposed search warrant.

130.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

131.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the full nature and extent of which is not

known to all of the targets of the investigation. Accordingly, there is good cause to seal these

documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Andrew Mitchell
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 8th day of August, 2018.

The Honorable Beryl A. Howell
Chief United States District Judge

-35-

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following Twitter accounts, which are stored at premises owned, maintained, controlled, or operated by Twitter, Inc. ("Twitter"), a company headquartered in San Francisco, California:

███████████

## ATTACHMENT B

I.     **Information to be disclosed by Twitter**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, Inc. ("Twitter"), including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A:

A.     All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

B.     The content of all communications (public or private) sent to or from, stored in draft form in, or otherwise associated with the account, including the content of all messages, attachments, and header information;

C.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

D.     All other content associated with the account, including, but not limited to, posts, documents, spreadsheets, photos, and videos;

E.     All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (i.e., "mentions" or "replies");

F.     All photographs and images in the user gallery for the account;

G.     All location data associated with the account, including all information collected by the "Tweet With Location" service;

H.     All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

I.     All data and information that has been deleted by the user;

J.     A list of all of the people that the user follows on Twitter and all people who are following the user (i.e., the user's "following" list and "followers" list);

K.     A list of all users that the account has "unfollowed" or blocked;

L.     All "lists" created by the account;

M.    All information on the "Who to Follow" list for the account;

N.    All privacy and account settings;

O.    All records of Twitter searches performed by the account, including all past searches saved by the account;

P.    All current and historical subscriber and payment information, including full name, e-mail address (including any secondary or recovery email addresses), physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, telephone number, websites, screen names, user identification numbers, security questions and answers, registration IP address, payment history, and other personal identifiers;

Q.    All email addresses and telephone numbers ever registered (whether successfully or not) to the account, including dates of any changes and the IP addresses used for any changes;

R.    All past and current usernames, account passwords, and names associated with the account, including dates of any changes and the IP addresses used for any changes;

S.    All data and information associated with the profile page, including photographs;

T.    All advertising data relating to the account, including, but not limited to, information regarding unique advertising IDs associated with the user, any devices used to access the account, application IDs, UDIDs, payment information (including, but not limited to, full credit card numbers and expiration dates and PayPal accounts), ads clicked, and ads created;

U.    The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

V.    All transactional records associated with the account, including any IP logs or other records of session times and durations;

W.    Any information identifying the device or devices used to access the account, including a device serial number, a GUID or Global Unique Identifier, a phone number, serial numbers, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access the account;

X.    All activity logs for the account;

Y.    All location information for the account, including all  location data collected by any plugins or widgets;

Z.    The types of service utilized by the user;

AA.   All information about the account's use of Twitter's link service, including all website links embedded in, exporting data to, or importing data from, the account's website or blog;

BB.   All full website links that were shortened by Twitter's link service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

CC.   All information about connections between the account and third-party websites and applications, including any Twitter, Facebook or other social networking accounts to which posts from the account are sent;

DD.   All data and information that has been deleted by the user;

EE.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

FF.   All privacy settings and other account settings, including email addresses or other accounts that the account has blocked;

GG.   Information regarding linked accounts, including accounts linked by cookie, IP address (including registration IP address), advertising ID, User Client UUID, User Guest Cookie ID, Known Device Token, Normalized Email Address, Android ID, IMEI, GUID, device identifier, or any other account or device identifier;

HH.   Information regarding accounts linked to accounts to which the Target Accounts are linked;

II.   All records pertaining to communications between the Service Provider and any person regarding the user or the user's account with the Service Provider, including contacts with support services, records of actions taken, and investigative or user complaints concerning the subscriber.

## II.   Information to be Seized by the Government

Any and all records that relate in any way to the accounts described in Attachment A which consists of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 3 (accessory after the fact), 18 U.S.C. § 4 (misprision of a felony), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1030 (unauthorized access of a protected computer); 18 U.S.C. §§ 1505 and 1512 (obstruction of justice), 18 U.S.C. § 1513 (witness tampering), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (attempt and conspiracy to commit wire fraud), and 52 U.S.C. § 30121 (foreign contributions ban) for the period from June 1, 2015 to the present, including:

a.   All records, information, documents or tangible materials that relate in any way to communications regarding hacking, release of hacked material, communications with persons or entities associated with WikiLeaks, including but not limited to Julian Assange, or communications regarding disinformation, denial, dissembling or other obfuscation about knowledge of, or access to, hacked material;

b.   All records, information, documents or tangible materials that relate in any way to communications or meetings involving Jerome Corsi, ███████████ Julian Assange, █████████████████████ Randy Credico, or any individual associated with the Trump Campaign;

c.   Communications, records, documents, and other files related to any expenditure, independent expenditure, or disbursement for an electioneering communication;

d.   Records of any funds or benefits disbursed by or offered on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.   All images, messages, communications, calendar entries, search terms, "address book" entries and contacts, including any and all preparatory steps taken in furtherance of the above-listed offenses;

f.   Communications, records, documents, and other files that reveal efforts by any person to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

g.   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

h.   Evidence indicating the account user's state of mind as it relates to the crimes under investigation;

i.   The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

j.   Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

k.   All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

l.   The identity of any non-U.S. person(s)—including records that help reveal the whereabouts of the person(s)—who made any expenditure, independent expenditure, or disbursement for an electioneering communication; and

m.   The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with the account about any matters relating to activities conducted by on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

n.   Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

o.   All existing printouts from original storage which concern the categories identified in subsection II.a.